UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ────────────────────────────── ) | |
| BN FARM LLC d/b/a THE FARM BAR AND ) | |
| GRILLE ESSEX, BNIPSWICH LLC d/b/a ) | |
| FOX CREEK TAVERN f/k/a EN FUEGO ) | |
| COCINA MEXICANA, BN MARINA LLC, ) | |
| BNR BEVERLY INC d/b/a EN FUEGO ) | |
| BEVERLY, BNR SALISBURY LLC d/b/a ) | |
| PORTSIDE WATERFRONT KITCHEN & ) | |
| BAR, BNR METHUEN LLC d/b/a THE ) | |
| MILLER'S TAVERN a/k/a THE MILLER ) | |
| TAVERN, BNFARMDOVER, LLC d/b/a THE ) | **Civil Action No. 1:20-cv-10874-MBB** |
| FARM BAR & GRILLE DOVER, ) | |
| BNRFARMMANCH LLC d/b/a THE FARM ) | |
| BAR & GRILLE MANCHESTER, BNR ) | |
| HAMPTON LLC d/b/a THE 401 TAVERN ) | |
| and BN REALTY LIMITED LIABILITY ) | |
| COMPANY, ) | |
|     Plaintiffs/Defendants-in-Counterclaim, ) | |
| ) | |
| v. ) | |
| ) | |
| THE CINCINNATI CASUALTY COMPANY,) | |
|     Defendant/Plaintiff-in-Counterclaim. ) | |
| ────────────────────────────── ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'/DEFENDANTS'-IN-COUNTERCLAIM MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... i

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................ 2

    1.   The Standard of Review........................................................................... 8

    2.   The All-Risk Policy Covers Fortuitous Losses Not Otherwise Excluded ........................... 9

    3.   The Plaintiffs Sustained a Direct "Physical Loss" Under the Policy................................ 12

    4.   Loss of Functionality Constitutes "Physical Loss"........................................... 18

    5.   COVID-19 is a Covered "Natural Disaster" ................................................. 19

CONCLUSION..................................................................................................... 20

# TABLE OF AUTHORITIES

*Cases*

*10E, LLC v. Travelers Indem. Co. of Conn.*,
No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653 (C.D. Cal. Sept. 2, 2020)…………FN10

*Advance Cable Co., LLC v. Cincinnati Ins. Co*.,
788 F.3d 743, 746 (7th Cir. 2015)…………………………………12, 13, 15, 16, 17, FN9

*AJC Intern., Inc. v. Triple-S Propledad*, 790 F.3d 1, 7 (1st Cir. 2015)……………………………9

*American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 78 (Wis. 2004)……….10

*Arbeiter v. Cambridge Mut. Fire Ins. Co.*,
1996 WL 1250616 at * 3 (Mass. Super. Ct. March 15, 1996)…………………………FN7

*August A. Busch & Co. of Mass. v. Liberty Mut. Ins. Co.*,
158 N.E.2d 351, 353 (Mass. 1959)…………………………………………………………8, 17

*Bleich v. Maimonides Sch*., 849 N.E.2d 185, 191 (Mass. 2006)…………………………………12

*Boazova v. Safety Ins. Co*., 968 N.E.2d 385, 390 (Mass. 2012)……………………………...…8

*Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 952 (Mass. 1998)……………………………...…8

*Cody v. Connecticut Gen. Life Ins. Co*., 439 N.E.2d 234, 237 (Mass. 1982)………………………8

*Commonwealth v. Samuel S.*, 69 N.E.3d 573, 577 (Mass. 2017)…………………………………12

*Continental Cas. Co. v. Gilbane Bldg. Co.,* 461 N.E.2d 209, 212 (Mass. 1984)…………………8

*Diesel Barbershop*, *LLC v. State Farm Lloyds*,
No. 5:20-CV-461-DAE, 2020 WL 4724305………………………………………FN10

*Driscoll v. Providence Mut. Fire Ins. Co*., 867 N.E.2d 806, 808 (Mass. App. Ct. 2007)……..9, 12

*Essex Ins. Co. v. BloomSouth Flooring Corp*., 562 F.3d 399, 404 (1st Cir. 2009)………………13

*Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889, 890 (Pa. 2020)…………………………..20

*General Mills, Inc. v. Gold Medal Ins. Co*., 622 N.W. 147, 152 (Minn. Ct. App. 2001)…………..18

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America*,
2014 WL 6675934, at * 6 (D. N.J. Nov. 25, 2014)………………………………………..18

*Hakim v. Massachusetts Insurers' Insolvency Fund*,
675 N.E.2d 1161, 1164 (Mass. 1997)…………………………………………………...8

*Manpower Inc. v. Ins. Co. of the State of Pennsylvania*,
2009 WL 3738099, at *5 (E.D. Wis. Nov. 3, 2009)…………………………………………15

*Massachusetts Property Ins. Underwriting Ass'n v. Berry*,
    954 N.E.2d 584, 588 (Mass. App. Ct. 2011)……………………………………..….11

*Matzner v. Seaco Ins. Co*.,
    1998 WL 566658 at \*\* 3-4 (Mass. Super. Ct. Aug. 12, 1998)……………….…..17, FN7

*Mehl v. The Travelers Home & Marine Ins. Co.*,
    Case No. 16-CV-1325-CDP (E.D. Mo. May 2, 2018)……………………….…..…..14

*Mellin v. Northern Sec. Ins. Co., Inc.*, 115 A.3d 799, 805 (N.H. 2015)…………………………14

*Mellon v. Hingham Mut. Fire Ins. Co.*, 472 N.E.2d 674, 675 (Mass. App. Ct. 1984)……...….9, 11

*North State Deli, Inc., et. al. v. The Cincinnati Ins. Co*., *et. al.,*
    N.C. Sup. Ct., Case No. 20-CVS-02569, Durham County, Oct. 9, 2020……......16, 17, FN8

*Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*,
    2016 WL 3267247, at \*5 (D. Or. June 7, 2016),
    *vacated as a condition of settlement*, 2017 WL 1034203 (D. Or. Mar. 6, 2017)………..…19

*Pilgrim Ins. Co. v. Molard*, 897 N.E.2d 1231, 1236 (Mass. App. Ct. 2008)………..…………..8

*Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co*.,
    311 F.3d 226, 236 (3d 2002)……………………………………………………15, 18

*Prudential Prop. & Cas. Ins. Co. v. Lilliard-Roberts*,
    CV-01-1362-ST, 2002 WL 31495830, at \* 9 (D. Or. June 18, 2002)……………….…..18

*Rose's 1, LLC v. Erie Insurance Exchange*, No. 2020 CA 002424 B, 2020 WL 4589206…..FN10

*Santos v. Metropolitan Property & Casualty Ins. Co*., 201 A.3d 1243, 1247 (N.H. 2019)………..17

*Schiappa v. Nat'l Marine Underwriters, Inc*., 775 N.E.2d 791, 794 (Mass. App. Ct. 2002)…..…..9

*Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006)………………FN11

*Standard Elec. Supply Co. v. Norfolk & Dedham Mut. Fire Ins. Co*.,
    307 N.E.2d 11, 12 (Mass. App. Ct. 1974)……………………………………………9

*Studio 417, Inc. v. The Cincinnati Ins. Co*.,
    20-CV-03127-SRB, 2020 WL 4692385, at \* 5 (W.D. Mo. Aug. 12, 2020)…...………….15

*Turek Enterprises, Inc. v. State Farm Mutual Auto Ins. Co*.,
    2020 WL 5258484, at \* 3 (E.D. Mich. Sept. 3, 2020)……………………..…..10, FN6

*U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 884-885 (Fla. 2007)…………...……………10

*Valley Forge Ins. Co. v. Field,* 670 F.3d 93, 99 (1st Cir. 2012)……………………..…………..12

*Welch Foods, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    659 F.3d 191, 194 (1st Cir. 2011)……………………………………………………12

*Welton Enterprises, Inc. v. Cincinnati Ins. Co.*,
    131 F. Supp. 3d 827, 835 (W.D. Wisc. 2015)…………...………………………15, 16, FN9

*Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968)………….14, 18

*Whitecap International Seafood Exporters, Inc. v. Eastern Insurance Group, LLC*,
    150 N.E.3d 336, 341 (Mass. App. Ct. 2020)……………………….……………………9

*Yale University v. Cigna Ins. Co.*, 224 F. Supp.2d 402, 412-413 (D. Conn. 2002)………………..14

**Other**

*Boston Public Health Commission – First Case of 2019 Novel Coronavirus
    Confirmed in Boston – February 1, 2020*……………………………………..……….11

*Community and Close Contact Exposures Associated with COVID-19 Among
Symptomatic Adults ≥18 Years in 11 Outpatient
Health Care Facilities — United States, July 2020*…………………………...………….FN1

*How COVID-19 Spreads*…………………………………………………………………..3

*Proclamation on Declaring a National Emergency Concerning the Novel
Coronavirus Disease (COVID-19) Outbreak*…………………………………………….……3

*Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*……..……3

*What is a Pandemic?*.....................................................................................................................3

*World Health Organization – Situation Report 204 – 11 August 2020*………….…………..4

## INTRODUCTION

This case concerns the availability of coverage to the plaintiffs under the business income, extra expense and civil authority provisions contained in their commercial property policy of insurance stemming from the 2019 novel Coronavirus known as SARS-CoV-2 ("COVID-19") pandemic. The legal issue to be resolved is whether the contaminant caused by COVID-19 constitutes "accidental physical loss or accidental physical damage."

The plaintiffs own and operate several restaurants across northern Massachusetts and southern New Hampshire offering onsite food and alcohol service to their patrons. In response to the COVID-19 pandemic, the plaintiffs' restaurants were initially forced to close and then operate limitedly as a result of executive orders issued by the Governors of the Commonwealth of Massachusetts and State of New Hampshire. These orders expressly prevented (initially) and then limited (more recently) the use of, and access to, the plaintiffs' insured property. These mandated closures and reduced operations resulted in, and continue to result in, the loss of income for the plaintiffs.

To protect against these sorts of unanticipated losses, the plaintiffs purchased business interruption insurance from the defendant, The Cincinnati Casualty Company ("Cincinnati"). The plaintiffs' "all-risk" policy of insurance covers every unimaginable risk unless its exclusions expressly removed that risk from coverage. Here, nothing in the plaintiffs' insurance policy excludes from coverage viruses, pandemics or government-mandated closures taken in response to viruses or pandemics. Where, as here, the legal question requires interpretation of a term which Cincinnati chose not to define (namely, "accidental physical loss or accidental physical damage"), the Court must turn to standard dictionary definitions. When that task is undertaken,

the contaminant caused by COVID-19 as well as the plaintiffs' loss of use and access to their properties unambiguously qualify for coverage under their all-risk policy.

Even if the undefined term "accidental physical loss or accidental physical damage" is deemed to be ambiguous or susceptible to differing, even if equally plausible, interpretations (one favoring coverage and the other disfavoring coverage), Massachusetts law requires any such ambiguity to be construed in favor of coverage and against Cincinnati. As a matter of law, summary judgment should enter in favor of the plaintiffs for all of the following reasons.

## FACTS

On January 30, 2020, the World Health Organization ("WHO") designated the COVID-19 outbreak as a Public Health Emergency of International Concern. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 2. On January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States as a result of the COVID-19 outbreak. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 3. The disease caused by COVID-19 is a highly contagious and, at times, fatal respiratory disease. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 4. COVID-19 has several modes of transmission, including through symptomatic transmission, pre-symptomatic transmission or asymptomatic transmission. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 5. Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual, while pre-symptomatic and asymptomatic transmission refers to transmission by an individual prior to experiencing symptoms or an infected individual who never exhibits symptoms of COVID-19. *See*, *Jnt. Statement of Undisputed Facts*, ¶¶ 6, 9. Data from published studies provide evidence that COVID-19 is transmitted from symptomatic, asymptomatic and pre-symptomatic people to others who are in close contact through respiratory droplets, by airborne transmission, by direct contact with infected persons or by contact with

contaminated objects and surfaces. *See*, *How COVID-19 Spreads*, October 28, 2020, attached as *Contested Exhibit 1*. The incubation period for COVID-19 — the time between exposure to the virus (becoming infected) and symptom onset — averages 5-6 days; however, the incubation period can be up to 14 days. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 8. The Centers for Disease Control and Prevention ("CDC") estimates that pre-symptomatic and asymptomatic people account for more than fifty percent of transmission. *See*, *Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, November 10, 2020, attached as *Contested Exhibit 2*.

The worldwide outbreak of COVID-19 and the effects of its extreme risk of person-to-person transmission throughout the United States has been declared a disaster that impacts the health, security and safety of the general public. *See*, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, March 13, 2020, attached as *Contested Exhibit 3*. On March 11, 2020, the WHO declared the COVID-19 outbreak as a pandemic, which remains in effect. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 11. The WHO declares an outbreak to be a pandemic when there is sustained and global spread of the underlying infection. *See*, *What is a Pandemic?* February 24, 2010, attached as *Contested Exhibit 4*.

On March 10, 2020, Governor Charles D. Baker of Massachusetts issued Executive Order No. 591 in which he declared a State of Emergency in Massachusetts in response to the COVID-19 outbreak. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 12. On March 13, 2020, President Donald J. Trump declared a National Emergency under the federal Stafford Act due to the COVID-19 pandemic to aid the nation's healthcare community in responding to COVID-19. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 13. On March 13, 2020, Governor Christopher T.

Sununu of New Hampshire issued Executive Order 2020-04 in which he declared a State of Emergency in New Hampshire in response to the COVID-19 pandemic. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 14. The proclamations of the States of Emergency in Massachusetts and New Hampshire remain in effect. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 15.

According to the CDC and the WHO, more studies are required to understand COVID-19 transmission, but the uncertainty has serious implications for close contact activities, such as the food service industry. *See*, *World Health Organization – Situation Report 204 – 11 August 2020*, attached as Contested *Exhibit 5*.[1] Given these implications, Governor Sununu issued Emergency Order No. 2 Pursuant to Executive Order No. 2020-04 on March 16, 2020, pursuant to which all restaurants and bars throughout New Hampshire were prohibited from offering onsite food and beverage consumption as a result of, and in response to, the COVID-19 pandemic. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 16. Similarly, Governor Baker issued COVID-19 Order No. 13 on March 17, 2020, which prohibited onsite food and beverage consumption in all restaurants and bars throughout Massachusetts as a result of, and in response to, the COVID-19 pandemic. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 17.[2] The Executive Orders prohibiting onsite food and beverage consumption in all restaurants and bars in Massachusetts and New Hampshire remained

---

[1]     According to the CDC, a case-control investigation of symptomatic outpatients from eleven healthcare facilities in the United States revealed that frequenting locations offering onsite eating and drinking options was associated with COVID-19 positivity such that adults with positive SARS-CoV-2 test results were approximately twice as likely to report having dined at a restaurant than those with negative Sars-CoV-2 test results. *See*, *Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States, July 2020*, September 11, 2020, attached as *Contested Exhibit 6*.

[2]     Governor Sununu's Emergency Order No. 2 Pursuant to Executive Order No. 2020-04 dated March 16, 2020 and Governor Baker's COVID-19 Order No. 13 dated March 17, 2020 shall collectively be referred to as "Executive Orders."

in effect until June 8, 2020 in Massachusetts and May 18, 2020 in New Hampshire. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 18.

As a result of the COVID-19 pandemic and in accordance with the Executive Orders, all of the plaintiffs' restaurants and bars were forbidden from offering or providing onsite food or beverage consumption. *See*, *Jnt. Statement of Undisputed Facts*, ¶¶ 16, 17. The plaintiffs did not provide either onsite or carryout/delivery service from March 16, 2020 (New Hampshire) and March 17, 2020 (Massachusetts) until April 22, 2020, provided carryout and delivery services at certain of their locations commencing on April 22, 2020 and finally resumed onsite service (at reduced capacity and subject to other restrictions) in their restaurants and bars on June 15, 2020 in New Hampshire and on June 22, 2020 in Massachusetts. *See*, *Affidavit of Bradley Atkinson*, ¶¶ 7-10; *Affidavit of Ryan Cox*, ¶¶ 7-10; *Affidavit of Noah Goldstein*, ¶ 7-11. As was true with the plaintiffs' restaurants, other businesses within one mile of each of the plaintiffs' locations similarly closed in accordance with the Executive Orders and suffered resultant direct physical loss of, or damage to, their property as a result of COVID-19. *See*, *Affidavit of Bradley Atkinson*, ¶ 16; *Affidavit of Ryan Cox*, ¶ 16; *Affidavit of Noah Goldstein*, ¶ 17.

On February 13, 2020, Cincinnati issued a commercial property policy of insurance, Policy No. EPP0568391, to "The Farm Bar and Grille" (the "Policy"). *See*, *Jnt. Statement of Undisputed Facts*, ¶ 24.[3] The Policy covers the period from February 13, 2020 through February 13, 2021. *See*, *See*, *Jnt. Statement of Undisputed Facts*, ¶ 25. In pertinent part, the "Building and

---

[3]      In accordance with an endorsement entitled "Named Insured Schedule - Massachusetts", Form No. AA 906 A MA 09 18, BN Farm Essex, BN Ipswich, BN Marina, BNR Beverly, BNR Salisbury, BNR Methuen, BNR Farm Dover, BN Farm Manchester, BNR Hampton and BN Realty were added as named insureds to the Policy.

Personal Property" Coverage Form, Form FM 101 05 16, contained within the Policy provides as follows:

### SECTION A. COVERAGE

> We will pay for direct "loss" to Covered Property at the "premises"
> caused by or resulting from any Covered Cause of Loss.
> *See*, *See*, *Jnt. Statement of Undisputed Facts*, ¶ 26 (emphasis in original).

Under the "Building and Personal Property" Coverage Form, a "loss" is defined as "accidental physical loss **or** accidental physical damage." *See*, *Jnt. Statement of Undisputed Facts*, ¶ 27 (emphasis added). The Policy does not, however, define either "physical loss" or "physical damage." The "Building and Personal Property" Coverage Form further provides coverage extensions for "Business Income and Extra Expense," which covers "loss of 'Business Income,'" "Extra Expenses" sustained during the "period of restoration," and loss of "Business Income and "Extra Expense" incurred caused by "civil authority." *See*, *Jnt. Statement of Undisputed Facts*, ¶¶ 29-31.

In pertinent part, the "Business Income (and Extra Expense) Coverage Form", Form FA 213 05 16, contained within the Policy provides additional details as to the availability of coverage under Form FA 213 05 16. *See*, *Def. Exhibit 6, Certified Copy of the Insurance Policy*.

The Policy does not include, and is not subject to, any endorsement or form which excludes, limits or excepts from coverage losses caused by, or resulting from, a pandemic, a virus or a communicable disease. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 32-33. This omission must be viewed in light of the promulgation of an exclusionary form by the Insurance Services Office ("ISO"), an insurance industry organization that develops standardized insurance policy programs and forms for use by insurers, in 2006 for losses "due to disease-causing agents such as viruses and bacteria" (the "Virus Exclusion"). *See*, *Jnt. Statement of Undisputed Facts*, ¶

32. In presenting the Virus Exclusion to state insurance regulators around the country, ISO explained:

> Disease-causing agents may render a product impure (change its quality or substance) or enable the spread of disease by their presence on interior building surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement or property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

*See*, *Def. Exhibit 13, ISO Circular LI-CF-2006-175*.

As a result of the COVID-19 pandemic and mandated prohibitions against onsite food and beverage service at all of their restaurants and bars, the plaintiffs made claim to Cincinnati under the Policy for their loss of business income, extra expenses and losses as a result of civil authority. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 34. On March 25, 2020, Cincinnati issued a reservation of rights letter in which it posited that "the fact of the [COVID-19] pandemic, without more, is not direct physical loss (or damage) to property at the premises" and that "direct physical loss or damage generally means a physical effect on covered property, such as deformation, permanent change in physical appearance or other manifestation of a physical effect." *See*, *Def. Exhibit 2*, *Reservation of Rights dated March 25, 2020*. On April 21, 2020, the plaintiffs demanded withdrawal of Cincinnati's reservation of rights and a provision of coverage for their loss of business income claim. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 36. On April 28, 2020, Cincinnati denied coverage under the Policy to the plaintiffs for their business income losses, extra expenses and losses caused by civil authority (the "Coverage Denial Letter"). *See*, *Jnt. Statement of Undisputed Facts*, ¶ 37. In its Coverage Denial Letter, Cincinnati largely premised its denial of coverage on the basis that there was allegedly "no evidence of direct

physical loss or damage at [the plaintiffs'] premises." *See*, *Def. Exhibit 5*, *Declination Letter dated April 28, 2020*.

**ARGUMENT**[4]

### 1. The Standard of Review

The proper interpretation of an insurance policy is a matter of law to be decided by a court. *Cody v. Connecticut Gen. Life Ins. Co*., 439 N.E.2d 234, 237 (Mass. 1982). Like all contracts, if the language of an insurance policy is unambiguous, then this Court construes the words "in their usual and ordinary sense", *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 952 (Mass. 1998), and reads the policy as written without revising it or changing the order of the words. *Continental Cas. Co. v. Gilbane Bldg. Co.,* 461 N.E.2d 209, 212 (Mass. 1984). When the policy language is ambiguous, "doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured." *August A. Busch & Co. of Mass. v. Liberty Mut. Ins. Co.*, 158 N.E.2d 351, 353 (Mass. 1959). "This rule of construction applies with particular force to exclusionary provisions." *Hakim v. Massachusetts Insurers' Insolvency Fund*, 675 N.E.2d 1161, 1164 (Mass. 1997).

An insured bears the initial burden of proving that the claimed loss falls within the coverage of the insurance policy. *Boazova v. Safety Ins. Co*., 968 N.E.2d 385, 390 (Mass. 2012). Once the insured does this, the burden then shifts to the insurer to show that a separate exclusion to coverage is applicable to the particular circumstances of the case. *Id*. At the summary judgment stage, however, an insurer also bears the burden of affirmatively showing either that there is no coverage or that the insured will be unable to show at trial that coverage exists. *Pilgrim Ins. Co. v. Molard*, 897 N.E.2d 1231, 1236 (Mass. App. Ct. 2008).

---

[4]     The parties stipulate that Massachusetts law applies in this matter.

**2.   The All-Risk Policy Covers Fortuitous Losses Not Otherwise Excluded**

As noted above, the Policy covers "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." This type of policy is called an "all-risk policy" and broadly covers all risks of loss to the specified property unless expressly caused by or resulting from an excluded peril. *AJC Intern., Inc. v. Triple-S Propledad*, 790 F.3d 1, 7 (1st Cir. 2015). *See also*, *Whitecap International Seafood Exporters, Inc. v. Eastern Insurance Group, LLC*, 150 N.E.3d 336, 341 (Mass. App. Ct. 2020) (all perils are covered unless excluded in an all-risk policy); *Driscoll v. Providence Mut. Fire Ins. Co*., 867 N.E.2d 806, 808 (Mass. App. Ct. 2007) (an all-risk policy affords a "wide breadth of coverage"). "An 'all-risk' policy is intended to insure against a 'fortuitous' event." *Mellon v. Hingham Mut. Fire Ins. Co.*, 472 N.E.2d 674, 675 (Mass. App. Ct. 1984). *See also, Standard Elec. Supply Co. v. Norfolk & Dedham Mut. Fire Ins. Co*., 307 N.E.2d 11, 12 (Mass. App. Ct. 1974) (an "all risk" policy covers some "kind of 'fortuitous loss' which is 'not usually covered under other insurance' and against which an 'all risk' policy is designed to extend protection"). Such fortuities are insured against even if they are not specified in the policy. *Mellon*, 472 N.E.2d at 675. Under an all-risk policy, the insured's burden is minimal and generally requires only that the insured show that a fortuitous loss has occurred. *Schiappa v. Nat'l Marine Underwriters, Inc*., 775 N.E.2d 791, 794 (Mass. App. Ct. 2002).

Here, the plaintiffs' all-risk Policy conspicuously lacks any exclusions for losses resulting from viruses, pandemics or government orders issued in response to viruses or pandemics. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 32-33.[5] In 2006, insurers began adding the Virus Exclusion

---

[5]    No doubt can exist that COVID-19 or any government orders issued in response to same, even if not specified in the Policy, was fortuitous as it was dependent on chance and not the result of the plaintiffs' misconduct.

following the severe acute respiratory syndrome ("SARS") outbreak. *Turek Enterprises, Inc. v. State Farm Mutual Auto Ins. Co.*, 2020 WL 5258484, at * 3 (E.D. Mich. Sept. 3, 2020).[6] Since the ISO Circular issued fourteen years ago, virus exclusionary provisions have become, and are, commonplace in all-risk business insurance policies. By drafting and circulating an industrywide circular, ISO and the greater insurance community impliedly acknowledged that, absent the Virus Exclusion, a virus or pandemic constitutes a covered cause of loss.

Though there was (and is) a Virus Exclusion which specifically excludes coverage for losses resulting from viruses, fungi and bacteria, Cincinnati tellingly opted not to include such an exclusion in the plaintiffs' all-risk Policy. The significance of this omission cannot be understated as the insurance industry actually created an exclusion, not used by Cincinnati in the Policy, to preclude coverage for viruses. Without the Virus Exclusion, coverage must exist because the insurance industry need not have created that exclusion if the event in question could never be considered a covered event. *See*, *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 884-885 (Fla. 2007) (where the ISO "has begun to issue an endorsement that may be included in a CGL policy", "[t]he fact that these additional endorsements may be included in CGL policies highlights that the ultimate analysis is governed by the actual language contained in the applicable insurance contract"); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 78 (Wis. 2004) (if, as the insurer contended, "losses actionable in contract are never CGL 'occurrences' for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary"). Concluding that coverage does not exist without the Virus Exclusion impermissibly renders the exclusion, when it is included in a policy, superfluous and

---

[6]     A 2006 ISO circular (the "ISO circular") explained that insurers were "presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms." *Turek*, 2020 WL 5258484, at * 3.

meaningless. *Massachusetts Property Ins. Underwriting Ass'n v. Berry*, 954 N.E.2d 584, 588

(Mass. App. Ct. 2011) (refusing to render policy terms superfluous and meaningless).

   In addition to its glaring failure to include the Virus Exclusion in the Policy, Cincinnati

should have been acutely aware of the burgeoning COVID-19 situation in China and its rapid

spread across all corners of the globe at the time it sold the Policy to the plaintiffs on February

13, 2020. By that date, the WHO designated the COVID-19 outbreak as a Public Health

Emergency of International Concern, Health and Human Services Secretary Azar declared a

public health emergency for the entire United States and the City of Boston had its first

confirmed case of COVID-19. *See*, *Jnt. Statement of Undisputed Facts*, ¶ 3; *Boston Public

Health Commission – First Case of 2019 Novel Coronavirus Confirmed in Boston – February 1,

2020*, attached as *Contested Exhibit 7*. Despite these widely known or knowable circumstances,

Cincinnati sold an all-risk Policy to the plaintiffs lacking the Virus Exclusion or any language

excluding, or purporting to exclude, from coverage any loss(es) or peril(s) caused by the

existence of COVID-19. Cincinnati cannot rewrite its Policy by retroactively engrafting a virus

or pandemic exclusion, which it opted not to include in the first instance, into it. If Cincinnati

sought or intended to preclude coverage for viruses or a pandemic, it was incumbent on it to

include precise and clear language in the Policy to accomplish this result. *See, Mellon*, 472

N.E.2d at 676 (if the insurer "intended to exclude such a loss it should have so stated with

precision and clarity"). Cincinnati simply failed to do so.

   In the end, nothing in the all-risk Policy excludes losses due to, or caused by, either

viruses, pandemics or government orders entered in response to viruses or pandemics. Absent

such exclusionary language, all perils, including those caused by COVID-19, are covered.

Cincinnati is bound by the terms of the all-risk Policy it sold to the plaintiffs as well as the coverage it broadly affords to them. *Driscoll*, 867 N.E.2d at 808.

### 3.   The Plaintiffs Sustained a Direct "Physical Loss" Under the Policy

The Policy expressly covers "accidental physical loss **or** accidental physical damage." *See*, *Jnt. Statement of Undisputed Facts*, ¶ 28 (emphasis added). Though Cincinnati could have defined, but did not, the terms "physical loss" and "physical damage", the Policy's usage of these terms in the disjunctive necessarily means that either a "loss" **or** "damage" is required. *Compare, Bleich v. Maimonides Sch*., 849 N.E.2d 185, 191 (Mass. 2006) (*"*It is fundamental to statutory construction that the word 'or' is disjunctive, 'unless the context and the main purpose of all the words demand otherwise'"). It also means that "loss" must be, and is, distinct and different from "damage." *Compare*, *Valley Forge Ins. Co. v. Field,* 670 F.3d 93, 99 (1st Cir. 2012) ("The three words are connected by the disjunctive 'or,' signaling they are to be read separately"); *Welch Foods, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 659 F.3d 191, 194 (1st Cir. 2011) ("[T]he terms are in the disjunctive, . . . and the word *or* must be given effect") (emphasis in original).

Because the Policy fails to define a direct "physical loss", this Court must rely on its plain and ordinary meaning. *See, Commonwealth v. Samuel S.*, 69 N.E.3d 573, 577 (Mass. 2017) ("we look to dictionary definitions as a guide to a term's plain or ordinary meaning"). The Merriam-Webster dictionary defines "direct", when used as an adjective, as "characterized by close logical, causal, or consequential relationship." *Merriam-Webster,* www.merriam-webster.com/dictionary/direct (last visited October 17, 2020). *See also*, *Advance Cable Co., LLC v. Cincinnati Ins. Co*., 788 F.3d 743, 746 (7th Cir. 2015) ("common sense suggests that [the word "direct"] is meant to exclude situations in which an intervening force plays some role in the

damage"). "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the laws of nature." *Merriam-Webster*, www.merriam-webster.com/dictionary/physical (last visited October 17, 2020). "Loss" is "the act of losing possession" and "deprivation." *Merriam-Webster*, www.merriam-webster.com/dictionary/loss (last visited October 17, 2020).

Applying these definitions, the plaintiffs sustained a non-excluded direct physical loss. First, there can be no dispute that an intervening force was not present here. The virus was and remains the sole culprit. *Advance Cable*, 788 F.3d at 746. As such, the plaintiffs satisfy the "direct" criterion.

Second, the loss was physical. In *Essex Ins. Co. v. BloomSouth Flooring Corp*., 562 F.3d 399, 404 (1st Cir. 2009), the United States Court of Appeals for the First Circuit undertook an exhaustive analysis of the word "physical" when determining whether the presence of an odor can constitute "physical injury" to a building. The insurer maintained, in part, that there was no injury to "tangible" property as the odors injured the "air" and that an odor cannot constitute "physical injury" to property. *Id*. at 405. Citing two cases issued by the Superior Court of the Commonwealth of Massachusetts[7], the *BloomSouth* Court rejected each of the insurer's arguments and concluded that it was "persuaded both that odor can constitute physical injury to property under Massachusetts law" and that "an unwanted odor" that permeated the building "resulted in a loss of use of the building" and was "reasonably susceptible to an interpretation

---

[7]    In *Matzner v. Seaco Ins. Co*., 1998 WL 566658 at ** 3-4 (Mass. Super. Ct. Aug. 12, 1998), the Court ruled that the term "direct physical loss" was ambiguous and that "carbon monoxide contamination constitutes a direct physical loss of or damage to property" even though the contamination did not physically damage the building. In *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616 at * 3 (Mass. Super. Ct. March 15, 1996), the Court determined that oil fumes "are a physical loss which attach to the property."

that physical injury to property" was claimed. *Id.* at 406. The *BloomSouth* Court also concluded

that there was nothing in the policies which suggested that "odor cannot constitute physical

injury to property." *Id.* at 406. As *BloomSouth* makes clear, "physical loss" is not synonymous

with "physical damage."

        The conclusions reached in *BloomSouth* are dispositive here. There can be, and is, no

cogent reason why an odor constitutes a "physical" loss whereas a virus does not similarly

constitute such a loss. Both share similar characteristics: they are both intangible and invisible

and neither deforms or structurally alters a building. More fundamentally, nothing in the Policy,

as was true in the policies at issue in *BloomSouth*, suggests that a virus cannot constitute a

"physical" loss. Time and again, Courts have dismissed the notion that "physical" losses may

only occur in the limited circumstance where there is tangible, manifest or visible damage to the

physical structure itself. *See, e.g., Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d

52, 55 (Colo. 1968) (in the absence of a provision specifically limiting coverage to instances

where there is tangible or detectable injury to the physical structure, common sense requires that

a policy should not be so interpreted); *Mehl v. The Travelers Home & Marine Ins. Co.*, Case No.

16-CV-1325-CDP (E.D. Mo. May 2, 2018) (in response to denial of a claim stemming from the

discovery of brown recluse spiders, the Court observed that the insurer "point[ed] to no language

in the policy that would lead a reasonable insured to believe that actual physical damage is

required for coverage"); *Mellin v. Northern Sec. Ins. Co., Inc.*, 115 A.3d 799, 805 (N.H. 2015)

(presence of cat urine odor emanating from downstairs neighbor constituted a change that

"rendered the insured property temporarily . . . unusable or uninhabitable" to "support a finding

that the loss was a physical loss to the insured property"); *Yale University v. Cigna Ins. Co.*, 224

F. Supp.2d 402, 412-413 (D. Conn. 2002) (the plaintiff demonstrated that it suffered "'physical

loss of or damage to property'" as required under policy by alleging presence of asbestos and lead contamination in buildings); *Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (the presence or imminent threat of a release of asbestos would "eliminate[] or destroy[]" the function of the structure, thereby making the building "useless or uninhabitable").

Third, a covered "loss" occurred. The Policy defines "loss" as an "accidental physical loss or accidental physical damage." *See*, *Jnt. Statement of Undisputed Facts*, ¶ 27. Given the disjunctive nature of the definition, the Policy covers either loss or damage. *Welton Enterprises, Inc. v. Cincinnati Ins. Co.*, 131 F. Supp. 3d 827, 835 (W.D. Wis. 2015) (the disjunctive nature of the definition of "accidental loss or damage" suggests that there still may be "damage" that triggers coverage even without a quantifiable "loss" in value or function); *Manpower Inc. v. Ins. Co. of the State of Pennsylvania*, 2009 WL 3738099, at *5 (E.D. Wis. Nov. 3, 2009) ("'direct physical loss' must mean something other than 'direct physical damage'"). Unlike a "loss", "damage" refers to tangible or structural consequences resulting from, for example, a tornado. However, even without any "damage", there still may be a "loss." *Compare*, *Advance Cable*, 788 F.3d at 747 (it is a "sensible conclusion" that the policy contemplates the possibility that there may still be damage even without a measurable loss). There is, and can be, no reason to believe that the Cincinnati's inclusion of the word "loss", as distinct from its use of the word "damage", was superfluous. *Compare, Advance Cable*, 788 F.3d at 747 ("Cincinnati has given us no reason to believe that inclusion of the phrase 'or damage' in the definition of loss was superfluous"); *Welton Enterprises*, 131 F. Supp. 3d at 835 (Cincinnati failed to explain why its definition of "loss" was written as "accidental loss or damage" if both possibilities meant a reduction in usefulness, value or lifespan); *Studio 417, Inc. v. The Cincinnati Ins. Co.*, 20-CV-03127-SRB,

2020 WL 4692385, at * 5 (W.D. Mo. Aug. 12, 2020) (interpreting identical policy language as the Policy here in the context of a business interruption claim stemming from COVID-19, the Court concluded that Cincinnati improperly conflated the words "loss" and "damage" in support of its argument that the policies required a tangible, physical alteration); *North State Deli, Inc., et. al. v. The Cincinnati Ins. Co., et. al.,* N.C. Sup. Ct., Case No. 20-CVS-02569, Durham County, Oct. 9, 2020 (same).[8] These cases, all of which notably involved Cincinnati, demonstrate that requiring an actual physical alteration of property (namely, "damage") in order to trigger coverage for a "loss" improperly eviscerates the Policy's separate coverage for a "loss."

The Policy does not require a particular type or quantum of harm, as unsuccessfully urged by Cincinnati in *Advance Cable* and *Welton Enterprises.*[9] The Policy does not include any language in its definition of the word "loss" which excludes or limits coverage for nonstructural, invisible or intangible damage or, for that matter, any other kind, amount or type of particular damage. *Advance Cable*, 788 F.3d. at 747; *Welton Enterprises*, 131 F. Supp. 3d at 835. Had

---

[8]     A copy of *North State Deli, Inc., et. al. v. The Cincinnati Ins. Co., et. al.,* N.C. Sup. Ct., Durham County, Oct. 9, 2020 is attached. In *North State Deli*, the Court entered summary judgment against Cincinnati and in favor of a group of restaurants which asserted a claim for business interruption coverage stemming from COVID-19. *Id.* at 8. The *North State Deli* Court interpreted the same policy language as presented here and concluded, in part, that "the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions." *Id.* at 3 and 6.

[9]     In both *Advance Cable* and *Welton Enterprises*, Cincinnati unsuccessfully tried to avoid its coverage obligations in cases involving hail damage to roofs that was cosmetic but did not diminish their function or value. *Advance Cable*, 788 F.3d at 744; *Welton Enterprises*, 131 F. Supp. 3d at 829. The *Advance Cable* and *Welton Enterprises* Courts interpreted policy language which defined "Covered Causes of Loss" as "risks or direct physical loss" and then defined "loss" as accidental loss or damage." *Advance Cable*, 788 F.3d at 745; *Welton Enterprises*, 131 F. Supp. 3d at 830.

Cincinnati wished to exclude nonstructural, invisible or intangible damage from coverage, it should have written the Policy that way. *Advance Cable*, 788 F.3d. at 747.

Even if it is unclear whether the Policy intended "accidental physical loss" to be defined restrictively or to require tangible, visible or structural deformation or physical alteration of a building, Massachusetts (and New Hampshire) law requires a construction of the language of the Policy in a light most favorable to the plaintiffs, not Cincinnati. *August A. Busch & Co.*, 158 N.E.2d at 353; *Santos v. Metropolitan Property & Casualty Ins. Co*., 201 A.3d 1243, 1247 (N.H. 2019) (if one of the reasonable meanings of the language favors the policyholder, the ambiguity will be construed against the insurer in order to honor the insured's reasonable expectations). Even if Cincinnati proffers a reasonable interpretation of the words "accidental physical loss" wherein some form of physical alteration or degradation to property is required, the plaintiffs' ordinary meaning of these words is equally reasonable, rendering the Policy ambiguous. *See*, *North State Deli,* N.C. Sup. Ct., Durham County, Oct. 9, 2020 (giving the ambiguous term "direct physical loss" the reasonable definition which favors coverage, that term "includes the loss of use or access to covered property even where that property has not been structurally altered"); *Matzner*, 1998 WL 566658, at * 3 (where the phrase "direct physical loss or damage" was ambiguous as it could include only tangible damage to the structure or may also allow for a wider array of losses, the latter interpretation more favorable to the insured was adopted).

For all of these reasons, Cincinnati must indemnify the plaintiffs for their "direct physical loss" to their restaurants as COVID-19 constitutes a compensable "loss."[10]

---

[10] Many cases dismissing insureds' COVID-19 business interruption claims are inapposite. *Contrast, 10E, LLC v. Travelers Indem. Co. of Conn.*, No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653 (C.D. Cal. Sept. 2, 2020) (motion to dismiss allowed where the insured did not allege any physical loss, acknowledging it was not attempting to recover any losses from COVID-19 or its proliferation; policy in question contained a virus exclusion); *Rose's 1, LLC v. Erie Insurance*

### 4. Loss of Functionality Constitutes "Physical Loss"

The loss of functionality of the plaintiffs' restaurants is no less physical than the impact of a building having lost its roof to a tornado or hurricane. Even absent a physical alteration to the plaintiffs' restaurants, a "physical loss" occurred when their properties became unusable for their intended purposes as establishments offering onsite food and alcohol service. *See, e.g., Port Auth. of New York*, 311 F.3d at 236 ("[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct [physical] loss to its owner"); *Prudential Prop. & Cas. Ins. Co. v. Lilliard-Roberts*, CV-01-1362-ST, 2002 WL 31495830, at * 9 (D. Or. June 18, 2002) (citing cases supporting the proposition that "the inability to inhabit a building [is] a 'direct, physical loss' covered by insurance"); *General Mills, Inc. v. Gold Medal Ins. Co*., 622 N.W. 147, 152 (Minn. Ct. App. 2001) ("We have previously held that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way"); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America*, No. 2:12-cv-04418-WHW, 2014 WL 6675934, at * 6 (D. N.J. Nov. 25, 2014) ("courts considering nonstructural property damage claims have found that buildings rendered uninhabitable by dangerous gases or bacteria suffered direct physical loss or damage"); *Western Fire Ins. Co*., 437 P.2d at 55 (the policyholder suffered "direct physical loss" when the "accumulation of gasoline around and under the [building caused] the premises to become so infiltrated and saturated as to

---

*Exchange*, No. 2020 CA 002424 B, 2020 WL 4589206 (D.C. Super. Aug. 06, 2020) (insured alleged governmental shutdown orders alone caused loss, not COVID-19 or its proliferation, therefore case dismissed for failure to plead physical loss); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020) (motion to dismiss allowed where the insured did not allege any physical loss due to COVID-19 within or around its business but sought coverage for the resultant loss of use due to governmental shutdown orders; policy in question contained a virus exclusion).

be uninhabitable, making further use of the building highly dangerous"); *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at *5 (D. Or. June 7, 2016), *vacated as a condition of settlement*, 2017 WL 1034203 (D. Or. Mar. 6, 2017) (a partially open-aired theater suffered a physical loss when forced to cancel performances due to the presence of wildfire smoke in and around the premises, rendering the premises uninhabitable and unusable while the theater waited for the smoke to dissipate).[11]

This Court cannot add the words "structural", "tangible", "visible" or any other language to the term "accidental physical loss" as doing so would improperly increase the quantum of proof necessary for the plaintiffs to establish coverage under the Policy. Cincinnati had the option to include these words in the Policy, but it chose not to do so. Nothing about the ordinary meaning of the term "accidental physical loss" requires structural alteration of the property. Rather, the ordinary meaning of these words describes the scenario where, as here, businessowners lose the full range of rights and advantages of using or accessing their properties for their intended purposes. As a result of the COVID-19 pandemic, the plaintiffs' restaurants lost their functionality to offer onsite food and beverage services. This was the precise income-generating purpose for which the plaintiffs paid Cincinnati to insure their properties. This lost functionality constitutes a covered "accidental physical loss."

## 5. COVID-19 is a Covered "Natural Disaster"

The coverage broadly afforded under the all-risk Policy affords coverage for fortuitous events, such as natural disasters, absent a specific exclusion providing otherwise. The dangerous

---

[11]     There are cases which conclude that physical tangible alteration is required to show a "physical loss." *See, e.g., Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006).

conditions created by the COVID-19 pandemic have been deemed to amount to a "natural disaster", and "any location where two or more people can congregate is within the disaster area." *See, Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889, 890 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions"). If the effects of a tornado, hurricane or any other natural disaster are covered, then the effects of COVID-19, as a recognized "natural disaster", must be similarly covered.

## **CONCLUSION**

The contaminant caused by COVID-19 constitutes a covered "accidental physical loss" under the all-risk Policy sold by Cincinnati to the plaintiffs. Consequently, a declaration of coverage under the all-risk Policy for the plaintiffs' lost business income and extra expenses is, as a matter of law, warranted. Summary judgment should therefore enter in favor of the plaintiffs on their counts sounding in declaratory relief, breach of contract under the Business Interruption and Extra Expense provisions of the Policy and breach of contract under the Civil Authority provision of the Policy.

BN FARM LLC d/b/a THE FARM BAR AND GRILLE
ESSEX, BNIPSWICH LLC d/b/a FOX CREEK TAVERN
f/k/a EN FUEGO COCINA MEXICANA, BN MARINA
LLC, BNR BEVERLY INC d/b/a EN FUEGO BEVERLY,
BNR SALISBURY LLC d/b/a PORTSIDE
WATERFRONT KITCHEN & BAR, BNR METHUEN
LLC d/b/a THE MILLER'S TAVERN a/k/a THE MILLER
TAVERN, BNFARMDOVER, LLC d/b/a THE FARM
BAR & GRILLE DOVER, BNRFARMMANCH LLC
d/b/a THE FARM BAR & GRILLE MANCHESTER,
BNR HAMPTON LLC d/b/a THE 401 TAVERN and BN
REALTY LIMITED LIABILITY COMPANY,
By their attorney,


/s/ Seth H. Hochbaum
SETH H. HOCHBAUM – BBO NO. 568118
SARAH E. ECKERT – BBO NO. 688894
REGNANTE STERIO LLP
401 Edgewater Place, Suite 630
Wakefield, MA 01880-6210
shochbaum@regnante.com
seckert@regnante.com
(781) 246-2525

Dated: December 4, 2020

<u>CERTIFICATE OF SERVICE</u>

By the undersigned signature, I hereby certify on behalf of the above-captioned plaintiffs, that on December 4, 2020, a true and accurate copy of the foregoing document was electronically-filed with the Clerk of the Court via the Court's CM/ECF System and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Seth H. Hochbaum*
SETH H. HOCHBAUM – BBO NO. 568118
SARAH E. ECKERT – BBO NO. 688894
REGNANTE STERIO LLP
Edgewater Office Park
401 Edgewater Place, Suite 630
Wakefield, MA 01880-6210
shochbaum@regnante.com
seckert@regnante.com
(781) 246-2525