UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BN FARM LLC d/b/a THE FARM BAR AND
GRILLE ESSEX, BN IPSWICH LLC d/b/a
FOX CREEK TAVERN f/k/a EN FUEGO
COCINA MEXICANA, BN MARINA LLC,
BNR BEVERLY INC. d/b/a EN FUEGO
BEVERLY, BNR SALISBURY LLC d/b/a
PORTSIDE WATERFRONT KITCHEN &
BAR, BNR METHUEN LLC d/b/a THE
MILLER'S TAVERN a/k/a THE MILLER          CIVIL ACTION NO.
TAVERN, BNFARMDOVER, LLC d/b/a THE        20-10874-MBB
FARM BAR & GRILLE DOVER,
BNRFARMMANCH LLC d/b/a THE FARM
BAR & GRILLE MANCHESTER, BNRHAMPTON
LLC d/b/a THE 401 TAVERN AND BN
REALTY LIMITED LIABILITY COMPANY,
        Plaintiffs/Defendants-in-Counterclaim,

                    v.

THE CINCINNATI CASUALTY COMPANY,
        Defendant/Plaintiff-in-Counterclaim.

**MEMORANDUM AND ORDER RE:**
**PLAINTIFFS/DEFENDANTS-IN-COUNTERCLAIM MOTION FOR SUMMARY**
**JUDGMENT (DOCKET ENTRY # 47); CINCINNATI CASUALTY COMPANY'S**
**CROSS MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 51)**

**September 16, 2021**

**BOWLER, U.S.M.J.**

        Pending before this court is a motion for summary judgment

filed by plaintiffs/defendants-in-counterclaim BN Farm LLC d/b/a

The Farm Bar and Grille Essex ("BN Farm Essex"), BN Ipswich LLC

d/b/a Fox Creek Tavern f/k/a En Fuego Cocina Mexicana ("BN

Ipswich"), BN Marina LLC ("BN Marina"), BNR Beverly Inc. d/b/a

En Fuego Beverly ("BNR Beverly"), BNR Salisbury LLC d/b/a

Portside Waterfront Kitchen and Bar ("BNR Salisbury"), BNR

Methuen LLC d/b/a The Miller's Tavern a/k/a The Miller Tavern
("BNR Methuen"), BNRFarmDover, LLC d/b/a The Farm Bar and Grille
Dover ("BNR Farm Dover"), BNRFarmManch LLC d/b/a The Farm Bar
and Grille Manchester ("BN Farm Manchester"), BNRHampton LLC
d/b/a The 401 Tavern ("BNR Hampton"), and BN Realty Limited
Liability Company ("BN Realty").  (Docket Entry # 47).  Also
pending before the court is a motion for summary judgment filed
by defendant/plaintiff-in-counterclaim The Cincinnati Casualty
Company ("Cincinnati").  (Docket Entry # 51).

<u>PROCEDURAL BACKGROUND</u>

As operators of full-service restaurants in Massachusetts
and New Hampshire, BN Farm Essex, BN Ipswich, BN Marina, BNR
Beverly, BNR Salisbury, BNR Methuen, BNR Farm Dover, BN Farm
Manchester, BNR Hampton, and BN Realty ("plaintiffs") filed an
amended complaint against Cincinnati seeking a declaratory
judgment of coverage under commercial property insurance policy
number EPP0568391 ("the Policy") and damages for breach of
contract.  (Docket Entry # 42, ¶¶ 99-123) (Docket Entry # 53, ¶¶
1, 24).  Count I of the amended complaint requests a declaration
that: (a) plaintiffs have coverage for business income and civil
authority losses, as well as extra expenses, as a result of the
coronavirus ("COVID-19" or "COVID") pandemic under the Policy;
(b) Cincinnati owes plaintiffs payment for these losses and
extra expenses; and (c) the Policy lacks an exclusion that bars

or limits plaintiffs' coverage for business income and civil authority losses, as well as extra expenses. (Docket Entry # 42, pp. 19-21, ¶ 103).[1]  Count II seeks damages for breach of contract as a result of Cincinnati's refusal to cover plaintiffs' COVID-related business income losses and extra expenses under the Policy. (Docket Entry # 42, p. 22, ¶ 113). Count III seeks damages for breach of contract for Cincinnati's failure to provide coverage for plaintiffs' business income losses and extra expenses under the Civil Authority provision of the Policy. (Docket Entry # 42, pp. 23-24, ¶ 123).

Cincinnati filed an answer to the amended complaint with a counterclaim for a declaratory judgment against plaintiffs on the basis that coverage is unavailable under the Policy. (Docket Entry # 46).  Count I of the counterclaim asserts that the lack of direct physical loss and/or damage to plaintiffs' property precludes coverage under the Business Income and Civil Authority provisions of the Policy. (Docket Entry # 46, p. 26, ¶¶ 13-15).  Count II seeks declaratory relief because plaintiffs fail to satisfy the requirements of the Civil Authority provision since plaintiffs' property remained accessible. (Docket Entry # 46, pp. 26-27, ¶¶ 16-19).  Lastly, Count III of the counterclaim submits that the Ordinance or Law and the Delay

---

[1]  Page numbers refer to the docketed page number in the upper, right-hand corner of the docketed filings.

or Loss of Use exclusions preclude coverage.  (Docket Entry #
46, pp. 27-28, ¶¶ 20-25).

Plaintiffs filed the motion for summary judgment on counts
I through III of the amended complaint and Cincinnati's
counterclaim.  (Docket Entry # 47).  Cincinnati filed the cross
motion for summary judgment on all counts of the amended
complaint and the counterclaim.  (Docket Entry # 51).  "The
parties agree and stipulate that Massachusetts substantive law"
applies to their dispute.  (Docket Entry # 53, ¶ 40).  They also
concur "[t]he summary judgment record shall consist of agreed-
upon relevant documents and documents that are admissible by way
of judicial notice."  (Docket Entry # 17, p. 3).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine
whether trial is actually required.'"  <u>Tobin v. Fed. Express
Corp.</u>, 775 F.3d 448, 450 (1st Cir. 2014) (citation omitted).  It
is appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is
inappropriate "if the record is sufficiently open-ended to
permit a rational factfinder to resolve a material factual
dispute in favor of either side."  <u>Pierce v. Cotuit Fire Dist.</u>,
741 F.3d 295, 301 (1st Cir. 2014).  It is permissible to

consider "other materials" in the record beyond those cited to support or oppose a particular summary judgment motion.  Fed. R. Civ. P. 56(c)(3).

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction," and a "fact is 'material' when its (non)existence could change a case's outcome."  Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018).  The record is viewed in favor of the nonmoving party and reasonable inferences are drawn in his favor.  See Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (courts examine "'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor'"); Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  The parties submit a joint Local Rule 56.1 ("L.R. 56.1") statement of undisputed facts, as well as their own L.R. 56.1 statements, and Cincinnati filed a response to plaintiffs' statement.  (Docket Entries ## 48, 53, 56, 63).  Uncontroverted statements of fact in the moving party's L.R. 56.1 statement comprise part of the summary judgment record.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003).

## FACTUAL BACKGROUND

### I.  Coronavirus Pandemic

On January 30, 2021, the World Health Organization ("WHO") declared that the coronavirus, or SARS-CoV-2, outbreak was "a Public Health Emergency of International Concern." (Docket Entry # 53, ¶ 2). Following suit, the United States announced a public health emergency due to COVID-19 on January 31, 2020. (Docket Entry # 53, ¶ 3). WHO later declared the COVID-19 outbreak a pandemic on March 11, 2020. (Docket Entry # 53, ¶ 11). On March 13, 2020, President Donald J. Trump invoked the Stafford Act to designate the COVID-19 outbreak as both a pandemic and a national emergency. (Docket Entry # 53, ¶ 13) (Docket Entry # 53-7, p. 3).

COVID-19 is "highly contagious" and transmitted via "several modes," including close contact with pre-symptomatic, asymptomatic, and symptomatic individuals. (Docket Entry # 53, ¶¶ 4-5, 7-9) (Docket Entry # 48-1, p. 1). In plaintiffs' restaurants, customers interact with surfaces made of steel, glass, plastic, and copper, among other materials. (Docket Entry # 53, ¶¶ 10, 22-23). The Centers for Disease Control and Prevention ("CDC") warns that respiratory droplets of infected individuals may accumulate on such surfaces. (Docket Entry # 53, ¶¶ 7-9) (Docket Entry # 48-1, p. 2) (Docket Entry # 48-10) (Docket Entry # 48-11) (Docket Entry # 48-14, p. 1). Although this method of viral transmission is uncommon, "[i]t is possible that a person could get COVID-19 by touching a surface or object

that has the virus on it and then touching [his or her] own mouth, nose, or eyes."  (Docket Entry # 48-14, p. 1).

"Studies indicate COVID-19 is primarily transmitted from infected people to others when people are in close contact with each other (within about 6 feet, or 2 arm lengths), through respiratory droplets."  (Docket Entry # 53, ¶¶ 7-9).  The transmission of the virus via aerosols between individuals more than six feet apart remains a matter of scientific debate.[2] (Docket Entry # 48-3).  For example, an August 2020 article notes "growing evidence that in addition to contact and drople[t] spread, the transmission of [COVID-19] via aerosols is plausible under favorable conditions, particularly in relatively confined settings with poor ventilation and long duration exposure to high concentrations of aerosols . . . ."[3]  (Docket Entry # 48-3, p. 2).  COVID-19 is "most commonly spread[] during close contact[,]" such as within six feet of an infected individual, and "can sometimes" spread "by airborne transmission" of respiratory droplets or smaller particles from infected individuals greater than six feet away or left in the air after the infected person leaves the space.  (Docket Entry #

---

[2]   The summary judgment record is based on events transpiring in 2020 and early 2021.
[3]   Song Tang et al., *Aerosol Transmission of SARS-CoV-2? Evidence, Prevention, and Control*, Env't Int', Vol. 144, Nov. 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7413047; (Docket Entry # 48-3); see fn. 15 infra.

48-1, pp. 1-2).[4]  On-site indoor dining with tables spaced less than six feet apart poses a higher risk of contracting COVID-19 than outdoor drive-through or "curb-side pick up" of food. (Docket Entry # 48-14, p. 1).

As of December 24, 2020, the Massachusetts Department of Public Health reported 80 COVID-19 clusters in restaurants and food courts.  (Docket Entry # 48-18, p. 35).  Since the beginning of the COVID-19 outbreak in 2020, "plaintiffs have recorded at least one positive COVID-19 employee and/or patron at each of their restaurants":

    a. Miller's Tavern: [four] employees, some of whom visited other restaurants, and [one] patron;
    b. En Fuego Beverly: [four] employees and [15] patrons;
    c. 401 Tavern: [five] employees, some of whom visited other restaurants, and [four] patrons;
    d. Portside Waterfront Kitchen & Bar: [three] employees, some of whom visited other restaurants, and [ten] patrons;
    e. The Farm Bar & Grille Essex: 12 employees, some of whom visited other restaurants, and 14 patrons;
    f. En Fuego Cocina Mexicana: [four] employees, some of whom visited other restaurants, and [six] patrons;
    g. The Farm Bar & Grille Dover: [ten] employees, some of whom visited other restaurants, and [ten] patrons;
    h. The [F]arm Bar & Grille Manchester: [six] employees, some of whom visited other restaurants, and [five] patrons.

(Docket Entry # 48-21, ¶ 7).

---

[4]  As stated in footnote 15, the allowance of Cincinnati's summary judgment motion renders Cincinnati's hearsay objections (Docket Entry # 62, pp. 18-20) to various exhibits (Docket Entry ## 48-1 to 48-4, 48-8) moot.

Because COVID-19 transmission through viral particles occurs more rapidly in indoor settings, the CDC recommended on December 21, 2020, that buildings utilize "ventilation mitigation strategies."  (Docket Entry # 48-13, p. 1).  While employing such mitigation strategies can ultimately "reduce the concentration of viral particles in the indoor air[,]" proper ventilation does not completely eliminate the risk of exposure to COVID-19.  (Docket Entry # 48-13, p. 1).  Increased ventilation, nevertheless, plays an important role in minimizing viral transmission when used in conjunction with cleaning products to rid surfaces of the virus.  (Docket Entry # 48-12). The CDC recommends using household cleaners "that meet EPA disinfection criteria" to "[c]lean and disinfect frequently touched surfaces" to maintain a healthy environment and reduce the spread of COVID-19 in bars and restaurants.  (Docket Entry # 48-14, p. 3).  The length of time a virus can survive and remain infective on a fomite surface "depends on a number of complex variables."  (Docket Entry # 48-11, p. 2); Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 Applied and Envtl. Microbiology, p. 1688 (Mar. 2007).  More broadly relative to indoor spaces, the Environmental Protection Agency maintains that "cleaning, sanitizing and ventilation are not enough to protect people from COVID-19," and recommends supplementing them

with other CDC-recommended practices to minimize indoor
transmission among people.  (Docket Entry # 48-12) (bold font
omitted).[5]

## II.  Government Orders

## A.  Massachusetts Orders

On March 10, 2020, Massachusetts Governor Charles D. Baker
("Governor Baker") declared a state of emergency due to COVID-
19, explaining that the virus "is a disaster that impacts the
health, security, and safety of the public."  (Docket Entry #
53-8, p. 2).  On March 17, 2020, Governor Baker issued COVID-19
Order No. 13, which temporarily closed nonessential businesses
and allowed their employees to work remotely.  (Docket Entry #
53, ¶ 17) (Docket Entry # 53-9, p. 3).  As "Essential Services,"
restaurants and bars were allowed to remain open "provided that
they follow the social distancing protocols set forth in
Department of Public Health guidance."  (Docket Entry # 53, ¶
17) (Docket Entry # 53-9, p. 3).  Whereas COVID-19 Order No. 13

---

[5]  Even accepting the premise that cleaning and ventilation
"are not enough to protect people from COVID-19" (Docket Entry #
48-12), the Policy provides coverage for physical loss or
physical damage to property (Docket Entry # 53-6, pp. 25, 60),
not people.  See Select Hosp., LLC v. Strathmore Ins. Co., Civil
Action No. 20-11414-NMG, 2021 WL 1293407, at *3 (D. Mass. Apr.
7, 2021) (virus cannot damage "physical structures because" it
"'harms human beings, not property'").  Separately, Cincinnati's
objection to plaintiffs' statement of material facts (Docket
Entry # 48, ¶¶ 27-28) that the documents cited do "not stand for
the proposition asserted" (Docket Entry # 63, ¶¶ 27-28) is well
taken.

prohibited indoor dining and the onsite consumption of food and
drink, it permitted restaurants and bars to offer carry-out and
delivery services.  (Docket Entry # 53, ¶ 17) (Docket Entry #
53-9, p. 3).  On June 6, 2020, COVID-19 Order No. 37 allowed
restaurants to provide outdoor dining as of June 8, 2020, and
thereafter resume indoor dining upon commencement of step two in
phase two of the Massachusetts reopening plan.  (Docket Entry #
53, ¶ 18) (Docket Entry # 53-11, pp. 4-5).

B.  New Hampshire Orders

On March 13, 2020, New Hampshire Governor Christopher T.
Sununu declared a state of emergency in Executive Order 2020-04.
(Docket Entry # 53, ¶ 14) (Docket Entry # 53-7).  New Hampshire
Emergency Order No. 2, which issued on March 16, 2020,
prohibited indoor dining and onsite consumption of food and
drink at restaurants.  (Docket Entry # 53, ¶ 16) (Docket Entry #
53-10, p. 2).  Specifically, New Hampshire Emergency Order No. 2
mandated that "food and beverage sales are restricted to carry-
out, delivery, curbside pick up, and drive through only, to the
extent permitted by current law."  (Docket Entry # 53-10, p. 2).
New Hampshire permitted outdoor dining on May 18, 2020.  (Docket
Entry # 53, ¶ 18).

C.  Impact of COVID-Related Orders on Plaintiffs' Restaurants

Although the COVID-related orders prevented onsite
consumption of food and drink at plaintiffs' restaurants in both

Massachusetts and New Hampshire during the above-noted time periods, they did not completely shut down plaintiffs' businesses because they did not prevent plaintiffs from offering carry out and delivery services.  (Docket Entry # 53, ¶¶ 16, 17).  However, plaintiffs' restaurants did not offer any services from either March 16, 2020 (in New Hampshire) or March 17, 2020 (in Massachusetts) through April 22, 2020.  (Docket Entry # 53, ¶ 19).  Between April 22 and May 13, 2020, "plaintiffs began providing carryout and delivery services at each of their locations."  (Docket Entry # 53, ¶ 20).  For example, BN Farm Essex and BNR Methuen offered carry out and delivery services starting on April 29 and May 9, 2020, respectively.  (Docket Entry # 48-19, p. 2) (Docket Entry # 48-21, p. 3).

Plaintiffs transitioned to indoor dining services with reduced capacity seating on June 15, 2020, at their New Hampshire locations and on June 22, 2020, at their Massachusetts locations.  (Docket Entry # 53, ¶ 21).  For reference, the full capacity of plaintiffs' restaurants prior to the Executive Orders was as follows:

   a. The Farm Bar and Grille Essex: one bar with [22] seats; [26] indoor table settings and ten outdoor table settings, seating a total of [125] patrons;
   b. Fox Creek Tavern: one bar with [14] seats; [20] indoor table settings and eight outdoor table settings, seating a total of [125] patrons;

    c. En Fuego Beverly: one bar with [25] seats; [18] indoor table settings and four outdoor table settings, seating a total of [100] patrons;

    d. Portside Waterfront Kitchen and Bar: one bar with [22] seats; [43] indoor table settings and six outdoor table settings, seating a total of [250] patrons;

    e. The Miller's Tavern: one bar with [40] seats; [35] indoor table settings and ten outdoor table settings, seating a total of [250] patrons;

    f. The Farm Bar and Grille Dover: two bars with ten seats; [24] indoor table settings and [12] outdoor table settings, seating a total of [150] patrons;

    g. The Farm Bar and Grille Manchester: two bars with [28] seats; [35] indoor table settings and eight outdoor table settings, seating a total of [250] patrons;

    h. The 401 Tavern: three bars with [25] seats; [15] indoor table settings and four outdoor table settings, seating a total of [125] patrons.

(Docket Entry # 48-19, ¶ 11) (Docket Entry # 48-20, ¶ 12)

(Docket Entry # 48-21, ¶ 16).

To resume indoor dining, plaintiffs implemented several modifications at their restaurants, including: "[b]arriers installed in between tables and bar seating; [t]ables moved, rearranged, and, in some instances, removed; [c]onstructed additional tables to accommodate social distancing and other mitigation measures mandated by the [New Hampshire and Massachusetts orders]; and [p]urchased heaters and tents and built new outdoor eating areas."[6]  (Docket Entry # 48-21, ¶¶ 5-8).

III.  The Policy

---

[6]  Cincinnati disputes whether these modifications were actually necessary in order for plaintiffs to resume indoor dining at the premises.  (Docket Entry # 63, p. 18).

A.  <u>Relevant Policy Provisions</u>

On February 13, 2020, Cincinnati issued the Policy, which provides all-risk coverage for commercial property through February 13, 2021, to BN Farm Essex.  (Docket Entry # 53, ¶ 24). BN Farm Essex, BN Ipswich, BN Marina, BNR Beverly, BNR Salisbury, BNR Methuen, BNR Farm Dover, BN Farm Manchester, BNR Hampton, and BN Realty were added to the Policy in the "Named Insured Schedule—Massachusetts."  (Docket Entry # 53, ¶ 24). The provisions at issue in the Policy are the Building and Personal Property Coverage Form (Form FM 101 05 16) and the Business Income (and Extra Expense) Coverage Form (Form FA 213 05 16).  (Docket Entry # 53, ¶¶ 26-31).

Under Section A, the Building and Personal Property Coverage Form states that the Policy "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."  (Docket Entry # 53-6, p. 25) (Docket Entry # 53, ¶ 26).  As stated in Section G, "Loss" is defined to mean "accidental *physical* loss or accidental *physical* damage."  (Docket Entry # 53-6, p. 60) (emphasis added); (Docket Entry # 53, ¶ 27).  The Policy does not define either "physical loss" or "physical damage."  (Docket Entry # 53, ¶ 28).

The Policy also addresses "coverage extensions" for business income and extra expenses as well as losses caused by civil authority:

14

**5. Coverage Extensions**

. . .

  **b. <u>Business Income and Extra Expense</u>**

   **(1)   Business Income**

   We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."  The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss . . .

   **(2)   Extra Expense**

   **(a)** We will pay Extra Expense you sustain during the "period of restoration".  Extra expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss . . .

   **(3)   Civil Authority**

   When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
   **(a)** Access to the area immediately surrounding the damaged property is prohibited by the civil authority as a result of the damage; and
   **(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property . . .

(Docket Entry # 53-6, pp. 40-41) (Docket Entry # 53, ¶ 29).  As used in the Business Income provision and the Extra Expense provision, Section G defines the "period of restoration" as the time period beginning at the time of the "direct 'loss'" and terminating "on the earlier of: **(1)** [t]he date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; or **(2)** [t]he date when business is resumed at a new permanent location."  (Docket Entry # 53-6, pp. 60-61) (Docket Entry # 53, ¶ 30).

Similar to Form FM 101 05 16, the Business Income (and Extra Expense) Coverage Form (Form FA 213 05 16) contains a coverage provision related to business income and civil authority losses, as well as extra expenses incurred during the restoration period:

1. **<u>Business Income</u>**

    a. We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations.  The "loss" must be caused by or result from a Covered Cause of Loss . . .

2. **<u>Extra Expense</u>**

    a. Extra Expense coverage is provided at the "premises" described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises".

    **b.**  Extra Expense means necessary expenses you sustain (as described in Paragraphs **2.c.**, **d.** and **e.**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

    **c.**  If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d.**) to:

      **(1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

        **(a)** At the "premises"; or

        **(b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

      **(2)** Minimize the "suspension" of business if you cannot continue "operations" . . .

**5. <u>Additional Coverages</u>**

. . .

    **b. <u>Civil Authority</u>**

    When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

      **(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

      **(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Docket Entry # 53-6, pp. 100-101) (Docket Entry # 53, ¶ 31).

B.  <u>Coverage Exclusions</u>

In 2006, the Insurance Services Office ("ISO") promulgated an Exclusion of Loss Due to Virus or Bacteria endorsement form to eliminate "coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress illness or disease."[7] (Docket Entry # 53-13, p. 10) (Docket Entry # 53, ¶ 32).  The Policy issued to plaintiffs lacks the Exclusion of Loss Due to Virus or Bacteria.  (Docket Entry # 53, ¶ 33).  Instead, the Policy contains exclusions entitled Ordinance or Law and Delay or Loss of Use.  Under the Ordinance or Law exclusion, the Policy does not provide coverage for a loss caused by "(1) [a]n ordinance or law that is enforced even if the building or structure has not been damaged; or (2) [t]he increased costs incurred to comply with an ordinance or law . . ."  (Docket Entry # 42-1, p. 26).  Furthermore, the Policy does not cover "[d]elay, loss of use or loss of market" under the Delay or Loss of Use exclusion.  (Docket Entry # 42-1, p. 29).

C.  Cincinnati's Denial of Coverage under the Policy

Plaintiffs submitted property loss notices regarding "insured sustained loss of business income due to the coronavirus outbreak" to Cincinnati on March 16, 2020.  (Docket

---

[7]   ISO transmitted the form to the Ohio Department of Insurance for review and approval on June 29, 2006.  On July 20, 2006, the department approved the form for inclusion in policies written on or after January 1, 2007.  (Docket Entry # 53-13).

Entry # 53-1) (Docket Entry # 53, ¶ 34).  On March 25, 2020,
Cincinnati responded with a notice it would investigate the
"claim under a full reservation of rights" and required
plaintiffs to provide further information regarding the claim,
such as documentation of COVID-19 cases at the restaurants.
(Docket Entry # 53-2, p. 2) (Docket Entry # 53, ¶ 35).
Plaintiffs again requested that Cincinnati provide coverage for
their claims, and further requested it rescind its reservation
of rights on April 21, 2020.  (Docket Entry # 53, ¶ 36).  On
April 28, 2020, Cincinnati denied coverage for plaintiffs'
claimed business income and civil authority losses, as well as
extra expenses.  (Docket Entry # 53, ¶ 37).  The denial included
an explanation that the coverage rejection was due to
plaintiffs' failure to provide evidence of "any direct physical
loss to property, as required by the Policy."  (Docket Entry #
53-5, p. 3).  Plaintiffs subsequently filed suit.

<u>DISCUSSION</u>

As noted, the parties agree that Massachusetts law applies,
and this court adheres to this reasonable choice.  In
Massachusetts the rules of construction for insurance contracts
are well established.  Words within an insurance contract, like
other contracts, are construed "'in their usual and ordinary
sense.'"  <u>U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc.</u>,
797 F.3d 116, 119 (1st Cir. 2015) (quoting <u>Boston Gas Co. v.</u>

Century Indem. Co., 910 N.E.2d 290, 304 (Mass. 2009)).
Dictionaries provide an appropriate source to ascertain the
usual and ordinary meaning of terms in an insurance contract.
See Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 499 (1st Cir.
2005) ("Massachusetts courts refer to dictionaries in
interpreting insurance contracts"); McLaughlin v. Berkshire Life
Ins. Co. of Am., 973 N.E.2d 685, 689 (Mass. App. Ct. 2012)
(citing Merriam-Webster's Collegiate Dictionary 858 (11th ed.
2005), to define "occupation" in disability insurance policy);
Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 785 (1st Cir.
2011) (examining dictionaries to ascertain meaning of term in
agreement's indemnity provisions under Massachusetts law); see
also Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass.
1998) ("mere existence of multiple dictionary definitions of a
word, without more," does not create ambiguity).

    "Under Massachusetts law," courts construe an insurance
policy "'beginning with the actual language of the policy, given
its plain and ordinary meaning.'" SAS Int'l, Ltd. v. Gen. Star
Indem. Co., Civil Action No. 20-11864-RGS, 2021 WL 664043, at *2
(D. Mass. Feb. 19, 2021) (citations omitted), *appeal docketed*,
No. 21-1219 (1st Cir. Mar. 24, 2021).  Policy provisions which
"'are plainly and definitely expressed in appropriate language
must be enforced in accordance with the policy's terms.'" Id.
(citations and brackets omitted).  However, "[i]f a term is

'susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one,' the term is ambiguous." Benchmark Constr., 797 F.3d at 119-120 (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)). "When there is doubt over the meaning of a term, it is 'appropriate "to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered."'" Benchmark Constr., 797 F.3d at 120 (citations omitted); accord Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 844 (Mass. 2013). Extrinsic evidence is not considered when answering the ambiguity question. See Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008) ("[t]o answer the ambiguity question," court first examines "language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties"); accord Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013) (citation omitted); Farmers Ins. Exch., 632 F.3d at 783 (citation omitted).

I. Cincinnati's Cross Motion for Summary Judgment

Cincinnati seeks summary judgment on all counts of the amended complaint and the counterclaim on the basis that the plain and unambiguous language of the Policy requires "physical loss" or "physical damage" to plaintiffs' property. (Docket Entry # 52, pp. 5-17) (Docket Entry # 53-6, p. 60). Neither the

presence or threat of the virus at plaintiffs' properties nor
the Massachusetts and New Hampshire orders constitute "physical
loss" or "physical damage" to the property, according to
Cincinnati.[8]   (Docket Entry # 52, pp. 5-17, 19).  Cincinnati
further submits that the Policy's language as a whole and, in
particular, the Period of Restoration provision, confirm the
coverage requirement of a physical alteration to the property.
(Docket Entry # 52, pp. 16-17).  Cincinnati also argues that the
absence of a virus exclusion is irrelevant and coverage under
the Civil Authority provision is lacking.  (Docket Entry # 52,
pp. 17-20).  Plaintiffs assert that "physical loss" does not
require a structural change to the property, the virus causes
"physical loss," and it cannot be removed entirely by cleaning.
(Docket Entry # 61, pp. 7-15).  They maintain the Civil
Authority provision provides coverage, Cincinnati's reliance on
the Period of Restoration provision fails, and the absence of a
virus exclusion is relevant.  (Docket Entry # 61, pp. 15-19).

1.  <u>"Accidental Physical Loss or Accidental Physical Damage"</u>

The Policy affords coverage "for direct 'loss,'" and it
defines "'Loss'" as meaning "accidental *physical* loss or
accidental *physical* damage."  (Docket Entry # 53-6, pp. 25, 60)

---

[8]   Cincinnati argues that *both* the presence of the virus (Docket
Entry # 52, pp. 12-13, 16) and/or the threat or possibility of
the virus (Docket Entry # 52, pp. 6, 11) at plaintiffs' property
is not an actual "physical" alteration of plaintiffs' property.

(emphasis added); (Docket Entry # 53, ¶¶ 26-27).  "[P]hysical"
modifies "loss" as well as "damage."  (Docket Entry # 53-6, p.
25) (Docket Entry # 53, ¶ 26).  The Policy does not define
"physical loss" or "physical damage."  (Docket Entry # 53-6, p.
25) (Docket Entry # 53, ¶ 28).

Cincinnati contends that the plain meaning of "physical
loss" or "physical damage," as incorporated in the Business
Income, the Extra Expense, and the Civil Authority coverage
provisions, unambiguously requires an actual, tangible,
structural alteration of plaintiffs' property.  (Docket Entry #
52, pp. 5-17) (Docket Entry # 53-6, p. 60) (Docket Entry # 53,
¶¶ 28-29).  Cincinnati submits that summary judgment is
therefore proper due to plaintiffs' failure to provide evidence
of the requisite "physical loss" or "physical damage."  (Docket
Entry # 52, p. 5).  Plaintiffs argue that the term "physical
loss" does not require a structural or tangible alteration to
property and that the term "physical loss" supports a broader
interpretation that includes "perils which render the covered
property uninhabitable, inaccessible or dangerous to use for the
owners and patrons . . . ."  (Docket Entry # 61, pp. 7-15).

Turning to the Policy language, Section A of the Building
and Personal Property Coverage Form states the Policy "will pay
for direct 'loss' to Covered Property at the 'premises' caused
by or resulting from any Covered Cause of Loss."  (Docket Entry

# 53-6, p. 25) (Docket Entry # 53, ¶ 26).  As stated previously, the Policy defines the term "Loss" as "accidental physical loss or accidental physical damage."  (Docket Entry # 53-6, p. 60) (Docket Entry # 53, ¶ 27).

While the Policy does not explicitly define "physical loss" or "physical damage," the plain meaning of the phrase and the words within it clarify the phrase's significance.  See Kamakura, LLC v. Greater N.Y. Mut. Ins. Co., Civil Action No. 20-11350-FDS, 2021 WL 1171630, at *5 (D. Mass. Mar. 9, 2021), appeal docketed, No. 21-1259 (1st Cir. Apr. 13, 2021).  Used as an adjective, "physical" pertains to "material things" and "real, tangible objects."  Physical, Black's Law Dictionary (11th ed. 2019) (emphasis added); accord SAS Int'l, 2021 WL 664043, at *2 (defining "physical" as involving "'material universe'" and pertaining "'to real, tangible objects'") (quoting Black's Law Dictionary (11th ed. 2019)).  "Material things" are of a "worldly nature" and "consist[] of matter." Material, Merriam-Webster, https://www.merriam-webster.com /dictionary/material (last visited Aug. 29, 2021) ("Merriam-Webster").  The term "loss" within the phrase "physical loss" is defined, inter alia, as "the disappearance or diminution of value," Loss, Black's Law Dictionary (11th ed. 2019); accord SAS Int'l, 2021 WL 664043, at *2 (defining "loss" as "'disappearance or diminution of value'") (quoting Black's Law Dictionary (11th

24

ed. 2019))), although it is important to recognize that it is a loss "to property" (Docket Entry # 53-6, pp. 25, 40-41), and the modifier "physical" limits the loss to "*tangible* objects."  <u>See</u> <u>SAS Int'l</u>, 2021 WL 664043, at *2.  "Damage" denotes "[especially] physical harm that is done to something."  *Damage*, <u>Black's Law Dictionary</u> (11th ed. 2019); <u>accord</u> <u>SAS Int'l</u>, 2021 WL 664043, at *2 (defining "damage") (quoting <u>Black's Law Dictionary</u> (11th ed. 2019)).[9]

As indicated, the court in <u>SAS Int'l</u> interpreted the terms "physical," "loss," and "damage" based on the foregoing definitions in <u>Black's Law Dictionary</u> (11th ed. 2019).  <u>See</u> <u>SAS Int'l</u>, 2021 WL 664043, at *2.  These interpretations denote the term "physical" as "'*material*'" and as pertaining to "'*tangible* objects'" and the term "damage" as entailing "'physical harm.'" <u>Id.</u>  A covered claim therefore "requires some kind of tangible, material loss" to the insured property.  <u>Select Hosp., LLC v.</u> <u>Strathmore Ins. Co.</u>, Civil Action No. 20-11414-NMG, 2021 WL 1293407, at *2 (D. Mass. Apr. 7, 2021), *appeal docketed*, No. 21-

---

[9]   As discussed in Roman numeral II in the context of plaintiffs' summary judgment motion, plaintiffs argue that the disjunctive "or" signals separate meanings for "loss" and "damage."  (Docket Entry # 49, pp. 16-17).  Reading the term "loss" to encompass loss of use writes out the modifier "physical."  <u>Promotional Headwear</u>, 504 F. Supp. 3d at 1203 ("[p]laintiff's interpretation of 'loss' and 'damage'" as encompassing loss of use "would write out" modifier "physical" and modifier "direct").

1380 (1st Cir. May 13, 2021).  Arriving at a similar definition,
the court in SAS Int'l opines that, "[t]aken together," the
terms physical, loss, and damage "require some enduring impact
to the actual integrity of the property" which "does not
encompass transient phenomena of no lasting effect . . ."  SAS
Int'l, 2021 WL 664043, at *2; see Select Hosp., 2021 WL 1293407,
at *2 (interpreting "plain meaning of 'direct physical loss'" to
require "'enduring impact to the actual integrity of the
property'") (quoting SAS Int'l, 2021 WL 664043, at *2); SAS
Int'l, 2021 WL 664043, at *3 ("'physical loss of'" phrase does
not cover deprivation of "property's use absent any tangible to
the property").

     The reasoning in SAS Int'l, which interprets language
similar to that in the Policy in the context of an insured
seeking coverage for suspension of business due to COVID-19, is
persuasive.  See SAS Int'l, 2021 WL 664043, at *2-3.  The plain
and unambiguous meaning of a "physical loss" or "physical
damage" in the Policy affording coverage "for direct 'loss'" to
property (Docket Entry # 53-6, pp. 25, 40-41, 60) requires
"tangible damage" consisting of "some enduring impact to the
actual integrity of the property at issue" rather than
"transient phenomena of no lasting effect . . ."  SAS Int'l,
2021 WL 664043, at *2-3 (emphasis added).  Loss of use without
"any tangible damage," id. at *3, such as to "the structure of a

                                26

building," Hampshire House Corp. v. Fireman's Fund Ins. Co.,
Civil Action No. 20-11409-FDS, 2021 WL 3812535, at *5 (D. Mass.
Aug. 26, 2021), or "some kind of tangible, material loss," Legal
Sea Foods, LLC v. Strathmore Ins. Co., Civil Action No. 20-
10850-NMG, 2021 WL 858378, at *3 (D. Mass. Mar. 5, 2021), *appeal
docketed*, No. 21-1202 (1st Cir. Mar. 19, 2021), is not covered
under the Policy.  See Kamakura, 2021 WL 1171630, at *5
(collecting Massachusetts cases which preclude coverage for
intangible losses).  Plaintiffs' loss of use interpretation of
the Policy's language is therefore unavailing.

The language of the Policy, taken as a whole and including
the Period of Restoration provision, confirms that "physical
loss" or "physical damage" denotes tangible damage to the actual
integrity or structure of the property.  As explained in Oral
Surgeons, "[t]he unambiguous requirement that the loss or damage
be physical in nature accords with the policy's coverage of lost
business income and incurred extra expense during the 'period of
restoration.'"[10]  See Oral Surgeons, P.C. v. Cincinnati Ins. Co.,
2 F.4th 1141, 1144 (8th Cir. 2021).  Similarly, the Period of
Restoration provision in the Policy limits Business Income and

---

[10]  The policy in Oral Surgeons required "'accidental physical
loss or accidental physical damage'" to property.  Oral
Surgeons, 2 F.4th at 1143.  The court held that "physical
alteration, physical contamination, or physical destruction"
satisfies the physical loss or damage requirement.  Id. at 1144.

Extra Expense coverage to: "**(1)** [t]he date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; or **(2)** [t]he date when business is resumed at a new permanent location."  (Docket Entry # 53-6, pp. 60-61) (Docket Entry # 53, ¶ 30).  By defining the dates as when the premises must be "repaired, rebuilt, or replaced" or when the business must relocate entirely (Docket Entry # 53-6, pp. 60-61) (Docket Entry # 53, ¶ 30), the Period of Restoration language assumes that a tangible, structural alteration of the premises has occurred.

The foregoing interpretation of the Policy's plain language comports with Massachusetts law which, as indicated, elucidates that "intangible losses" are not covered under the language requiring a "physical loss" or "physical damage."[11]  See Hampshire House, 2021 WL 3812535, at *5 (collecting cases); Kamakura, 2021 WL 1171630, at *5 ("'physical' loss of or damage"

---

[11]   The interpretation also aligns with cases not applying Massachusetts law.  See Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co., Civil Action No. 1:20-cv-02248-JPB, 2021 WL 778728, at *5 (N.D. Ga. Mar. 1, 2021) (plain meaning of "'direct physical loss' . . . requires actual, physical damage to the covered premises") (applying Georgia law), aff'd, 2021 WL 3870697 (11th Cir. Aug. 31, 2021) (unpublished); Summit Hosp. Grp., Ltd. v. Cincinnati Ins. Co., Civil Action No. 5:20-cv-254-BO, 2021 WL 831013, at *3-4 (E.D.N.C. Mar. 4, 2021) ("direct physical loss or damage to plaintiff's properties" is unambiguous and does not include intangible damage) (applying North Carolina law), appeal docketed, No. 21-1362 (4th Cir. Apr. 2, 2021).

does not include "coverage for financial or other intangible losses"); Legal Sea Foods, 2021 WL 858378, at *3 ("Courts in Massachusetts have had occasion to interpret the phrase 'direct physical loss' and have done so narrowly, concluding that it requires some kind of tangible, material loss."); Harvard St. Neighborhood Health Ctr., Inc. v. Hartford Fire Ins. Co., Civil Action No. 14-13649-JCB, 2015 WL 13234578, at *8 (D. Mass. Sept. 22, 2015) ("[i]ntangible losses do not" fall within "definition of 'direct physical loss'"); Eveden, Inc. v. N. Assurance Co., Civil Action No. 10-10061-GAO, 2014 WL 952643, at *5 (D. Mass. Mar. 12, 2014) ("Intangible losses, such as a defect in title or a legal interest in property, are generally not regarded as 'physical' losses in the absence of actual[] physical damage to the property."); Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co., 321 F. Supp. 2d 260, 264-265 (D. Mass. 2004) (collecting cases holding that diminution in value is not a "direct physical loss"); Pirie v. Fed. Ins. Co., 696 N.E.2d 553, 554-555 (Mass. App. Ct. 1998) (holding that an internal defect in a structure, such as the presence of lead paint, is not a "physical loss").  Construing the phrase "'physical loss of' to cover the deprivation of a property's *use* absent any tangible damage to the property distorts the plain meaning of the Policy."  SAS Int'l, 2021 WL 664043, at *3; accord Select Hosp., 2021 WL 1293407, at *3 (requiring impact on "structural

integrity" of insured property).  Likewise, it distorts the plain meaning of the phrase "physical loss" in the Policy to cover loss of use of plaintiffs' property, such as for indoor dining, without tangible damage to the property.

Similarly, the court in Harvard St. Neighborhood interpreted the phrase "direct physical loss or direct physical damage" to mean "'material.'"  Harvard St. Neighborhood, 2015 WL 13234578, at *1, 8.  As a result, the commercial insurance policies did not cover the theft of intangible company funds held in a bank account (rather than in the form of cash) as a "direct physical loss."  Id. at *8 (concluding that "funds deposited into a bank account do not have a physical or material existence and thus, are not susceptible to 'physical loss or damage'").

Moreover, a leading insurance treatise confirms that, in the absence of a tangible, material loss, i.e., a distinct and "physical *alteration* of the property," property insurance policies do not cover stand-alone economic loss.  See 10A Steven Plitt et al., Couch on Insurance § 148:46 (3d ed. 2021) (emphasis added) (physical loss "is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration

of the property"). Where, as here, the "provisions are plainly and definitely expressed in appropriate language," the Policy "is enforced in accordance with its terms." Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co., 734 F.3d 51, 55 (1st Cir. 2013) (applying Massachusetts law). Because the unambiguous "physical loss" and "physical damage" language is not "susceptible to more than one rational interpretation," an ambiguity does not arise.[12] Id.; see Kamakura, 2021 WL 1171630, at *5.

2. Business Income and Extra Expense Provisions

The Building and Personal Property Coverage provision states that "[Cincinnati] will pay for the actual loss of 'Business Income' and 'Rental Value' [plaintiffs] sustain due to the necessary 'suspension' of [their] 'operations' during the 'period of restoration.'" (Docket Entry # 53-6, pp. 40-41) (Docket Entry # 53, ¶ 29). As a requirement for Business Income coverage, "[t]he 'suspension' must be caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." (Docket Entry # 53-6, p. 40) (Docket Entry #

---

[12]    Accordingly, this court does not reach the issue of whether to construe the terms in a standard form against the insurer. See Given v. Com. Ins. Co., 796 N.E.2d 1275, 1278 (Mass. 2003) (because "approved wording" in standard policy is controlled by Insurance Commissioner, not insurer, ambiguities are not construed against insurer).

53, ¶ 29) (emphasis added).  The Policy's Extra Expense coverage compensates plaintiffs for costs they "would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss."[13]  (Docket Entry # 53-6, p. 41) (Docket Entry # 53, ¶ 29).

Accordingly, both the Business Income and Extra Expense provisions require a "'loss,'" defined as a "physical loss" or "physical damage" to property.  (Docket Entry # 53-6, p. 25) (Docket Entry # 53, ¶¶ 26-27).  As explained in Roman numeral I(1), these terms implicate *tangible* damage consisting of "some enduring impact to the actual *integrity* of the property."  SAS Int'l, 2021 WL 664043, at *2-3 (emphasis added); accord Legal Sea Foods, 2021 WL 858378, at *3.  The "physical loss" and "physical damage" phrases do not include transient phenomena.  See SAS Int'l, 2021 WL 664043, at *2.  Adhering to the plain meaning of these terms, the issue under the Business Income and Extra Expense provisions reduces to whether there was a "'loss' to the property" at plaintiffs' insured premises "caused by or resulting from any Covered Cause of Loss."  (Docket Entry # 53-6, pp. 40-41) (Docket Entry # 53, ¶ 29).  Plaintiffs submit that COVID-19 falls within the reach of these provisions.  (Docket

---

[13]   The Business Income (and Extra Expense) Coverage Form addresses coverage in similar terms.  (Docket Entry # 53-6, pp. 100) (Docket Entry # 53, ¶ 31).

Entry # 61, pp. 6-9).  Conversely, Cincinnati argues that COVID-
19 contamination does not cause the requisite "physical loss" or
"physical damage" required by the Policy's Business Income and
Extra Expense provisions.  (Docket Entry # 52, pp. 2, 5-6).
Cincinnati is correct.

The presence of COVID-19 in restaurants is not a "physical
loss" or "physical damage" to property under the Policy because
the virus had no physical effect on the property.  See Hampshire
House, 2021 WL 3812535, at *6 (collecting cases holding "actual
contamination of a property" lacks "the requisite 'physical'
effect"); Legal Sea Foods, 2021 WL 858378, at *3; SAS Int'l,
2021 WL 664043, at *2-3.  The majority of courts addressing
insurance coverage for business income losses related to COVID-
19 conclude that the presence of the virus either at a property
or on surfaces at the property does not constitute a "physical
loss" or "physical damage," despite its impact on the premises'
functionality.  Promotional Headwear Int'l v. Cincinnati Ins.
Co., 504 F. Supp. 3d 1191, 1202-1203 (D. Kan. 2020) ("even
assuming that the virus physically attached to covered property,
it did not constitute the direct, physical loss or damage
required to trigger coverage because its presence can be
eliminated"), appeal dismissed, No. 21-3000 (10th Cir. Jan. 5,
2021); Legal Sea Foods, 2021 WL 858378, at *3-4 ("[E]ven if"
plaintiff "properly alleged that COVID-19 caused business

interruption losses due to its presence at the Designated
Properties, it would not be entitled to coverage under the
Policy."); SAS Int'l, 2021 WL 664043, at *4 n.4 (observing that
"no reasonable construction of the phrase 'direct physical
loss,' however broad, would cover the presence of a virus").
Kamakura succinctly explains the distinction and reasoning
underlying this national trend in decisions: "The spread of the
coronavirus is of course 'physical' in the sense that the virus
is a submicroscopic organism, but under the plain language of
the policy, it is the loss or damage itself that must be
'physical.'" Kamakura, 2021 WL 1171630, at *6 (further noting
that presumed "'contamination' has no physical effect on the
property").

COVID-19's presence "'does not physically alter the
appearance, shape, color, structure, or other material dimension
of the property.'" Chelsea Ventures, LLC v. Cincinnati Ins.
Co., Civil Action No. 20-13002, 2021 WL 2529821, at *5 (E.D.
Mich. June 21, 2021). Unlike an odor, the presence of COVID-19
is undetectable and cleaning surfaces with certain disinfectants
can deactivate or eliminate the virus. Promotional Headwear,
504 F. Supp. 3d at 1203 (finding no "direct, physical loss or
damage required to trigger coverage because . . . routine
cleaning and disinfecting can eliminate the virus on surfaces");
SAS Int'l, 2021 WL 664043, at *4 (unlike an odor, "COVID-19 is

imperceptible" and "does not endure beyond" brief time period
"or a proper cleaning"); Uncork & Create LLC v. Cincinnati Ins.
Co., 498 F. Supp. 3d 878, 884 (S.D. W. Va. 2020), *appeal
docketed*, No. 21-1311 (4th Cir. Mar. 23, 2021).  As aptly argued
by Cincinnati (Docket Entry # 52, pp. 2, 12-13), although the
virus' viability following cleaning varies, COVID-19 still does
not cause "*physical* loss" or "*physical* damage" to property
(unlike smoke taint) because it only poses a threat of infection
to people, similar to other viruses (like influenza) that have
yet to merit coverage under property insurance policies.  See
Select Hosp., 2021 WL 1293407, at *3 ("A virus is incapable of
damaging physical structures because 'the virus harms human
beings, not property.'"); Legal Sea Foods, 2021 WL 858378, at
*4; Chelsea Ventures, 2021 WL 2529821, at *7; Uncork & Create,
498 F. Supp. 3d at 884.

    Moreover, the Period of Restoration confirms that COVID-19
contamination does not constitute "physical loss" or "physical
damage" as previously explained.  The language in this provision
provides coverage until the property "'should be repaired,
rebuilt or replaced" or until business resumes at a new location
(Docket Entry # 53-6, pp. 60-61) "assumes physical alteration of
the property, not mere loss of use."  Oral Surgeons, 2 F.4th at
1144.  Consequently, plaintiffs cannot prevail on their claim

for coverage under the Business Income and Extra Expense provisions of the Policy.

3.  <u>Civil Authority Provision</u>

The language of the Civil Authority provision requires "a Covered Cause of Loss" which "causes damage to property other than" plaintiffs' insured "Covered Property."  (Docket Entry # 53, ¶ 29) (Docket Entry # 53-6, p. 41).  A "Covered Cause of Loss" is defined as a "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."  (Docket Entry # 53-6, p. 27).  The provision's use of the term "Loss" denotes a "physical loss" or "physical damage," and a "Covered Cause of Loss" thus requires physical loss or physical damage, as correctly pointed out by Cincinnati.  (Docket Entry # 52, pp. 3-4) (Docket Entry # 53-6, p. 60).  Cincinnati therefore argues that "[j]ust as the virus is not causing direct physical loss or damage to the Plaintiffs' property, it is not causing direct physical loss or damage to other property."  (Docket Entry # 52, pp. 4, 19).  This court agrees.

The plain meaning of "physical loss" or "physical damage" entails tangible damage consisting of some enduring impact to the actual integrity of the property (as explained in Roman numeral I(1)), and COVID-19 does not cause such a physical loss or physical damage (as explained in Roman numeral I(2)). Plaintiffs do not identify facts that the virus caused such a

"physical loss" or "physical damage" to other property.  Hence, there is no coverage under the Civil Authority provision given the absence of a "Covered Cause of *Loss*" (Docket Entry # 53-6, pp. 27, 60) (emphasis added).  See, e.g., SAS Int'l, 2021 WL 664043, at *1 n.2, *2 ("'Civil Authority Coverage'" is limited to "'Covered Cause of Loss,'" which is "'direct physical loss,'" and "'physical'" involves "*material*" phenomena and pertains to "*tangible* objects") (denying coverage); accord Legal Sea Foods, 2021 WL 858378, at *3 ("'[d]irect physical loss' . . . requires some kind of tangible, material loss").

Moreover, "a majority of courts across the country" conclude "that restrictions on the use of an insured's property *due to government orders* are not 'physical losses,'" and "there is no indication" Massachusetts case law suggests "a different conclusion."  Vervaine Corp. v. Strathmore Ins. Co., Case No. SUCV20201378BLS2, 2020 WL 8766370, at *3 (Mass. Super. Dec. 21, 2020) (emphasis added); Marshall v. Safety Ins. Co., Case No. 2084CV02303-BLS2, 2021 WL 2226454, at *1 (Mass. Super. Ct. May 21, 2021) ("Governor's orders did not—either alone or in combination—cause a physical loss of or damage to property" under "Safety's policies").  For this reason, Cincinnati also argues that the Civil Authority provision fails to provide coverage because the Massachusetts and New Hampshire orders did not "prohibit[] access" to plaintiffs' property.  (Docket Entry

37

# 52, pp. 18-20).  Plaintiffs contend that the Civil Authority provision does not require the complete deprivation of access to their premises.  (Docket Entry # 61, pp. 15-16).  Here again, Cincinnati is correct.

The Civil Authority provision authorizes coverage "for the actual loss of 'Business Income' and necessary Extra Expense [plaintiffs] sustain caused by action of civil authority that *prohibits access* to the 'premises.'"  (Docket Entry # 53-6, p. 41) (Docket Entry # 53, ¶ 29) (emphasis added).  As used in this provision, "to prohibit" is synonymous with to forbid, preclude, or prevent.  *Prohibit*, <u>Black's Law Dictionary</u> (11th ed. 2019). Based on this definition, a limitation on plaintiffs' access to the premises falls short of the prohibition requirement in the Civil Authority provision.  <u>See</u> <u>Legal Sea Foods</u>, 2021 WL 858378, at *5 (courts "address[ing] equivalent civil authority provisions" draw "clear line between actions that 'prohibit' access to insured properties and those that merely 'limit' such access"); <u>accord</u> <u>Select Hosp.</u>, 2021 WL 1293407, at *4 (same). Because the Massachusetts and New Hampshire orders did not prevent restaurant staff from continuing to operate delivery and carry out services at the premises, access was not prohibited, forbidden, or precluded.  <u>See</u> <u>Select Hosp.</u>, 2021 WL 1293407, at *4 (finding that government orders allowing carry out and delivery services preclude Civil Authority coverage); <u>Kamakura</u>,

2021 WL 1171630, at *12 (finding no Civil Authority coverage because government orders "did not prohibit employees or customers from accessing the properties"); Legal Sea Foods, 2021 WL 858378, at *5.  As explained in Kamakura, these orders only restrict certain uses of the premises rather than prohibit access.  Kamakura, 2021 WL 1171630, at *12.

Plaintiffs nevertheless maintain that COVID-19 is a "natural disaster which threatens" property.  (Docket Entry # 61, p. 15).  Citing Desrosiers v. Governor, 158 N.E.3d 827, 837 (Mass. 2020), and a statement in Cincinnati's supporting memorandum that the Policy "'is designed to indemnify for loss or damage to property and loss of income,'" such as "fire or storm," plaintiffs reason that the Civil Authority provision covers natural disasters that threaten property, i.e., COVID-19. (Docket Entry # 61, p. 15).  The Policy, however, does not reference coverage for natural disasters in any of its provisions.  (Docket Entry # 53-6).  The plain language of the Civil Authority provision does not provide coverage for a "natural disaster," as plaintiffs claim.  Unlike a fire or storm which tangibly alters a premises, COVID-19 is not a "Covered Cause of Loss" under the Policy because it fails to satisfy the requisite "physical loss" or "physical damage."  (Docket Entry # 53-6, p. 27).  The Policy also states that its "terms can be amended or waived only by endorsement issued by [Cincinnati] and

made a part of this [P]olicy." (Docket Entry # 53-6, p. 4).
Accordingly, the statement in Cincinnati's supporting memorandum
cannot add either COVID-19 or a natural disaster as a "Covered
Cause of Loss." (Docket Entry # 53-6, p. 4).

4. Virus Exclusion

Cincinnati contends that the lack of a virus exclusion in
the Policy does not entitle plaintiffs to coverage. It points
out that an exclusion only becomes relevant in the event that
coverage exists with the "predicate" of a "direct *physical* loss
or damage to property." (Docket Entry # 52, p. 17). Plaintiffs
argue that since the all-risk Policy lacks a virus exclusion
like the one contained in the ISO circular, coverage for COVID-
related losses remains available. (Docket Entry # 61, pp. 17–
19).

As already discussed, plaintiffs fail to provide sufficient
evidence to create a genuinely disputed fact that COVID-19
causes "physical loss" that would establish coverage under the
Business Income, Extra Expense, and Civil Authority provisions.
Because these provisions do not establish coverage, "a policy's
exclusionary provisions cannot be used to establish coverage in
the first instance." Chelsea Ventures, 2021 WL 2529821, at *9.

Courts applying Massachusetts law concur that "the 'absence
of an express [virus] exclusion does not operate to create
coverage' for pandemic-related losses." SAS Int'l, 2021 WL

40

664043, at *4 (quoting Given v. Com. Ins. Co., 796 N.E.2d 1275, 1279 (Mass. 2003)); accord Select Hosp., 2021 WL 1293407, at *4 (quoting SAS Int'l, 2021 WL 664043, at *4); Legal Sea Foods, 2021 WL 858378, at *4 (quoting SAS Int'l, 2021 WL 664043, at *4); Kamakura, 2021 WL 1171630, at *8 (quoting Given, 796 N.E.2d at 1279).  Plaintiffs' contention based on the ISO circular is misguided because the absence of an exclusion does not create coverage.  Kamakura, 2021 WL 1171630, at *8 (policy's absence of exclusions developed by ISO did not create coverage).

In sum, the relevant Policy language is unambiguous and does not engender "'more than one rational interpretation,'" Kamakura, 2021 WL 1171630, at *5, regarding "physical loss" or "physical damage" to plaintiffs' property.  The unambiguous language of the Policy requires tangible damage consisting of "some enduring impact to the actual integrity of the property." SAS Int'l, 2021 WL 664043, at *2-3.  Neither the presence of COVID-19, nor the Massachusetts and New Hampshire orders constitute a "physical loss" or "physical damage" under the plain meaning of these terms.  The government orders also did not prohibit access within the meaning of the Civil Authority provision.  Plaintiffs therefore fail to satisfy the requirements for coverage under the Civil Authority, Business Income, and Extra Expense provisions of the Policy.  Summary

judgment in favor of Cincinnati is thus appropriate based on the plain meaning of the Policy's language.

II.  <u>Plaintiffs' Motion for Summary Judgment</u>

Plaintiffs seek summary judgment on the counts in the amended complaint and counterclaim on the basis that: (a) COVID-19 is a "physical loss" under the Policy; (b) they have coverage under the Policy for business income and civil authority losses, as well as extra expenses, resulting from the COVID-19 pandemic; and (c) the Policy lacks a virus exclusion that precludes coverage for business income and civil authority losses as well as extra expenses.  (Docket Entry # 47, p. 1) (Docket Entry # 49, pp. 14-21, 23-25).  More broadly, they submit that the "'all-risk'" Policy covers a "'fortuitous' event," such as COVID-19, even if "not specified in the [P]olicy."  (Docket Entry # 49, p. 13).  They also argue that one interpretation of a "physical loss" as used in the Policy encompasses loss of use, thus making the Policy language ambiguous.  (Docket Entry # 49, p. 21).  Together with the absence of the virus exclusion, an objectively reasonable insured would therefore expect coverage for plaintiffs' business income losses related to COVID-19, according to plaintiffs.  (Docket Entry # 49, p. 25). Cincinnati opposes the motion because the Policy's plain language is unambiguous and does not encompass loss of use, and

plaintiffs fail to satisfy the "physical loss" or "physical damage" requirements.  (Docket Entry # 62).

1.  <u>"Accidental Physical Loss or Accidental Physical Damage"</u>

Plaintiffs contend that the Policy language is ambiguous because the disjunctive nature of the phrase "accidental physical loss or accidental physical damage" requires either "loss" or "damage."  (Docket Entry # 49, p. 16).  They submit that this disjunctive construction supports an interpretation of the Policy that does not conflate the meaning of "physical loss" with "physical damage."  (Docket Entry # 49, p. 16).  Plaintiffs reason that the scope of "physical loss" must be distinct from that of "physical damage" and, therefore, broad enough to encompass situations where the insured "properties became *unusable* for their intended purposes as establishments offering onsite food and alcohol service."  (Docket Entry # 49, p. 21) (emphasis added).  Plaintiffs assert that, unlike "physical damage," a "physical loss" is not restricted to "tangible or structural" damage of the insured premises.  (Docket Entry # 49, pp. 18-19) (Docket Entry # 61, p. 11).  Claiming that the Policy language is susceptible to two possible interpretations (requiring either a tangible, structural alteration of the premises or a loss of use) which gives rise to an ambiguity or doubt regarding the proper meaning, plaintiffs assert the issue

of coverage must be resolved against Cincinnati.  (Docket Entry
# 49, pp. 20-21, 25).  This court disagrees.

As previously discussed in Roman numeral I(1), this court
first examines the plain meaning of the Policy language to
determine whether an ambiguity exists.  See Clark Sch., 734 F.3d
at 57 ("[W]hen a contract is not ambiguous, a party can have no
reasonable expectation of coverage when that expectation would
run counter to the unambiguous language of an insurance
policy"); SAS Int'l, 2021 WL 664043, at *2 (Massachusetts courts
construe an insurance policy "'beginning with the actual
language of the polic[y], given its plain and ordinary
meaning'") (citation omitted); Promotional Headwear, 504 F.
Supp. 3d at 1196 ("'To be ambiguous, a contract must contain
provisions or language of doubtful or conflicting meaning, as
gleaned from a natural and reasonable interpretation of its
language.'") (citation omitted).

Plaintiffs argue that the use of "or" in the phrase
"accidental physical loss or accidental physical damage" is
disjunctive.  On this basis, they further argue that "loss" and
"damage" have separate meanings.  (Docket Entry # 49, pp. 19-
20).

First and foremost, the import of plaintiffs' argument
renders the term "physical" superfluous or meaningless.  See
Summit Hosp. Grp., 2021 WL 831013, at *4 (adopting plaintiff's

44

reading "would allow for intangible damage to trigger coverage" rendering "other sections of the provision ineffective"); see also UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co., 929 F.3d 11, 24 (1st Cir. 2019) (if court adopted "UBS's construction, the other prongs would be rendered superfluous, and [the court] refuse[s] to construe the definition of 'claim' in a way that would make two-thirds of it meaningless"). Cincinnati correctly points out (Docket Entry # 62, pp. 6-7) that plaintiffs' proposed interpretation of "physical loss" renders the term "physical," which requires a tangible or some endurable impact to the actual integrity of the property, meaningless as a modifier of both "loss" and "damage."[14]  See Promotional Headwear, 504 F. Supp. 3d at 1202; Oral Surgeons, 2 F.4th at 1144.

It is true that some courts distinguish "loss" from "damage" in that the former term entails the "'act of losing possession' and 'deprivation.'"  Studio 417, Inc. v. Cincinnati Ins. Co., 478 F. Supp. 3d 794, 800 (W.D. Mo. 2020) (finding complaint plausible based inter alia on allegation COVID-19 "attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable, resulting in direct physical loss to the premises and property'") (emphasis added); see also Advance

---

[14]  See footnote nine.

45

Cable Co., LLC v. Cincinnati Ins. Co., 788 F.3d 743, 747 (7th
Cir. 2015) ("even without a measurable 'loss' in value or in
function, the policy expressly contemplates the possibility that
there may still be 'damage,' presumably giving it a different
meaning than the word 'loss'") (internal quotation marks
omitted).  The court in Zwillo V, Corp. v. Lexington Insurance
Co., however, distinguished Studio 417's holding that "loss" and
"damage" have distinct meanings.  Zwillo V, Corp. v. Lexington
Ins. Co., 504 F. Supp. 3d 1034, 1039-40 (W.D. Mo. 2020) (finding
that "'direct physical loss of or damage to property' requires
physical alteration of property"), *appeal dismissed*, No. 21-
1015, 2021 WL 2792962 (8th Cir. Mar. 18, 2021).  Specifically,
the court found that the phrase "'direct physical loss of or
damage to' does not encompass simple deprivation of use," and
"reading the term 'loss' in isolation goes against Missouri's
well-established proviso that an insurance policy must be read
as a whole."  Id. at 1040.  The court in Zwillo also pointed out
that the decision in Studio 417 left open the possibility that
"'[s]ubsequent case law in the COVID-19 context, construing
similar provisions, and under similar facts, may be
persuasive.'"  Id. at 1043 (quoting Studio 417, 478 F. Supp. 3d
at 805).  Other courts adhere to Zwillo's result by classifying
Studio 417 as an outlier.  See Legal Sea Foods, 2021 WL 858378,
at *4; SAS Int'l, 2021 WL 664043, at *5 n.8 ("Other courts have

either tiptoed around [Studio 417's] holding, criticized it, or treated it as the minority position"). The foregoing decisions relied upon by plaintiffs represent a minority position and are not binding precedent. Consequently, this court declines to adhere to them.

For reasons fully explained in Roman numeral I(1), the Policy language as to the meaning of "physical loss" or "physical damage" is unambiguous and requires tangible damage consisting of "some enduring impact to the actual integrity of the property." SAS Int'l, 2021 WL 664043, at * 2. In light of the absence of an ambiguity or even doubt, the reasonable expectations doctrine, as urged by plaintiffs (Docket Entry # 49, p. 25), does not apply. See Clark Sch., 734 F.3d at 57 ("reasonable expectations doctrine has no application" where "[t]here is no uncertainty as to the meaning of the terms"); CWC Builders, 134 F. Supp. 3d 589, 603 (D. Mass. 2015); Finn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 896 N.E.2d 1272, 1278-79 (Mass. 2008) (concluding that reasonable expectations doctrine does not apply where "exclusion unambiguously precludes coverage").

2. Business Income and Extra Expense Provisions

The Policy provides Business Income coverage for a "'suspension' . . . caused by direct 'loss' to" the insured property "caused by or resulting from any Covered Cause of

Loss." (Docket Entry # 53-6, p. 40). Extra Expense coverage compensates plaintiffs for costs they "would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (Docket Entry # 53-6, p. 41). Plaintiffs argue that coverage is available under the Business Income and Extra Expense provisions because COVID-19 constitutes a "physical loss." (Docket Entry # 49, p. 14).

First, the plain and ordinary meaning of "physical loss," as fully explained in Roman numeral I(1), precludes coverage for the presence of COVID-19, as explained in Roman numeral I(2). Second, the three cases, as well as others, which plaintiffs rely upon to present the argument (Docket Entry # 49, pp. 14-15, 17-18) are distinguishable. See Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 404 (1st Cir. 2009) (odor causing physical injury to property); Matzner v. Seaco Ins. Co., Civil Action No. 96-0498-B, 1998 WL 566658, at *3-4 (Mass. Super. Ct. Aug. 12, 1998) (carbon monoxide contamination causing physical loss to property); Arbeiter v. Cambridge Mut. Fire Ins. Co., Civil Action No. 9400837, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996) (fumes causing physical loss).

According to plaintiffs, the impact of a virus on their premises is analogous to that of carbon monoxide, oil fumes, and carpet odor because it causes an intangible, nonstructural loss when it "attaches to and contaminates the air." (Docket Entry #

49, p. 17).  Because it cannot be completely eliminated from the premises, COVID-19 contamination made plaintiffs' restaurants "unusable for their intended purposes as establishments offering onsite food and alcohol service," according to plaintiffs. (Docket Entry # 49, p. 21) (Docket Entry # 61, pp. 14-15).

The facts in Essex as well as in Arbeiter are distinguishable from those in the case at bar.  See Essex, 562 F.3d at 405 (holding that odor that "'permeated the building'" constituted physical damage to property); Arbeiter, 1996 WL 1250616, at *2 (concluding that "fumes are a physical loss which attaches to the property").  First, as pointed out by Cincinnati (Docket Entry # 62, p. 7), the insurance policies at issue in Essex allowed coverage for "'[l]oss of use of tangible property *that is not physically injured*.'"  Essex, 562 F.3d at 401 (emphasis added); (Docket Entry # 62, p. 8).  Essex is therefore distinguishable because the Policy in the case at bar requires "*physical* loss" or "*physical* damage."  (Docket Entry # 53-6, p. 60) (emphasis added).  Second, as reasoned in SAS Int'l, Essex is distinguishable because it involved an odor, which is "'reasonably susceptible to an interpretation [of causing] *physical injury* to property.'"  SAS Int'l, 2021 WL 664043, at *4 (quoting Essex, 562 F.3d at 406) (emphasis added).

Thus, unlike the odor in Essex, the presence of COVID-19 in plaintiffs' restaurants "does not permeate property" or attach

to it, but rather "lives on surfaces, either for a matter of hours or days or until those surfaces are decontaminated." Kamakura, 2021 WL 1171630, at *7 n.9; see SAS Int'l, 2021 WL 664043, at *4 (finding that "COVID-19 is imperceptible" and "does not endure beyond a brief passage of time or a proper cleaning"); Am. Food Sys. v. Fireman's Fund Ins. Co., Civil Action No. 20-11497, 2021 WL 1131640-RGS, at *4 ("[t]he characteristic determining whether a substance causes physical loss under the Policy is not its origin, but rather its effect on property"), appeal docketed, No. 21-1307 (1st Cir. Apr. 30, 2021).  Even if plaintiffs' restaurants were contaminated with COVID-19, numerous courts aptly find that cleaning surfaces with disinfectants can eliminate the virus' presence.  Uncork & Create, 498 F. Supp. 3d at 883 ("COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant").

Massachusetts courts also distinguish the odor in Essex and the fumes in Arbeiter and Matzner from the characteristics of COVID-19 contamination.  See Select Hosp., 2021 WL 1293407, at *3 (concluding that Essex, Matzner, and Arbeiter are "inapposite" because "'loss of use' was caused by an odor or fumes rather than the Government Orders at issue"); Legal Sea Foods, 2021 WL 858378, at *4 ("COVID-19 fundamentally differs from the unpleasant odors and fumes at issue in [Essex and

Matzner]"); Kamakura, 2021 WL 1171630, at *7.  As astutely

reasoned in Hampshire House:

> To the extent there was any "loss of use" of the properties
> in *Matzner, Arbeiter*, and *BloomSouth Flooring*, it was
> caused by the odor or fumes. Here, conclusory allegations
> aside, plaintiffs' loss of use was caused by the government
> orders; it was not caused by the presence of the
> coronavirus itself.

Hampshire House, 2021 WL 3812535, at *8; accord Vervaine, 2020

WL 8766370, at *3 ("restrictions on the use of the property—for

example, a prohibition against in-person dining at restaurants—

does not as a matter of law amount to 'direct physical loss or

damage' *to* the premises").  Plaintiffs' argument, therefore,

fails to provide sufficient evidence to create a genuinely

disputed fact that COVID-19 causes "physical loss" under the

Policy's Business Income and Extra Expense provisions.

3.  Loss of Functionality

 Plaintiffs also argue that the "loss of functionality" to

their restaurants is a "physical loss" because the "properties

became unusable for their intended purposes" of "offering onsite

food and alcohol service."  (Docket Entry # 49, pp. 21–22).

Plaintiffs maintain the loss of functionality of the insured

premises constitutes the requisite "physical loss."  (Docket

Entry # 49, p. 21).  According to plaintiffs, this loss of

functionality causes "businessowners [to] lose the full range of

rights and advantages of using or accessing their properties for

their intended purposes."   (Docket Entry # 49, p. 22).
Cincinnati disagrees because the scope of plaintiffs' use of the
premises was merely altered, and the Loss of Use exclusion in
the Policy bars coverage in any event.   (Docket Entry # 62, pp.
15-16).   Cincinnati is correct.

Plaintiffs could still use their restaurants for their
intended purpose by offering carry-out or delivery services.
(Docket Entry # 53-9, p. 3) (Docket Entry # 53-10, p. 2).   As
more fully explained previously, the reduced use did not
physically impact the actual integrity of the property.   See
Vervaine, 2020 WL 8766370, at *4-5 ("[p]laintiffs' actual
property remains the same as it was pre-pandemic, and patrons
and employees were not prohibited from entering the premises");
Kamakura, 2021 WL 11716309, at *6 (rejecting argument that
COVID-19 and subsequent government shutdown orders rendered
"property unusable for its intended purposes" due to "no
physical effect on the property").

Plaintiffs further contend that the Policy provides
coverage for "loss of functionality" because Cincinnati opted to
write the Policy to address "physical loss", instead of
"structural" or "tangible" loss.   (Docket Entry # 49, p. 22).
Interpreting "physical" loss as requiring a tangible alteration
to the insured property, however, does not alter the Policy's
language.   As explained in Roman numeral I(1), the court in SAS

Int'l interpreted the plain meaning of the term "physical" as involving "'*material*'" and pertaining to "'*tangible* objects.'" SAS Int'l, 2021 WL 664043, at *2.  In contrast to plaintiffs' assertion that a reasonable interpretation of "physical loss" does not require structural alteration, Massachusetts law interprets the phrase as implicating a loss "to a tangible object, such as the structure of a building."  Hampshire House, 2021 WL 3812535, at *5; Kamakura, 2021 WL 1171630, at *5; see SAS Int'l, 2021 WL 664043, at *3 (deprivation of "*use* absent" tangible damage to "property distorts" Policy's "plain meaning"); Harvard St. Neighborhood, 2015 WL 13234578, at *8 ("Massachusetts courts have interpreted the phrase 'direct physical loss' narrowly, meaning 'material.'"); accord SAS Int'l, 2021 WL 664043, at *2 (interpreting terms as requiring "some enduring impact to" integrity of property).

Furthermore, whereas plaintiffs allege that the diminished functionality of their restaurants resulted in lost revenue (Docket Entry # 49, p. 22), Cincinnati correctly argues that the Loss of Use exclusion (Docket Entry # 42-1, p. 29) bars coverage for plaintiffs' claim resulting from the reduced functionality of the premises.  (Docket Entry # 62, p. 15).  The Loss of Use exclusion precludes coverage for the "[d]elay, loss of use or loss of market."  (Docket Entry # 42-1, p. 29).  The explicit mention of "loss of use" in this provision (Docket Entry # 42-1,

p. 29) encompasses plaintiffs' allegations regarding the "loss of functionality" of the insured premises.  The court in Vervaine addressed a similar situation where the insurance policies contained a Loss of Use exclusion, and it rejected the plaintiffs' interpretation of the policy as providing coverage for loss of use.  Vervaine, 2020 WL 8766370, at *4.  The reasoning in Vervaine applies equally to plaintiffs' analogous asserted loss of functionality.

4.  Virus Exclusion

Plaintiffs next argue that because the all-risk Policy lacks a virus exclusion like the one contained in the ISO circular, coverage for COVID-related losses is available. (Docket Entry # 49, p. 23).  Plaintiffs further assert that Cincinnati should have included a virus exclusion because Cincinnati either knew or should have known that "the burgeoning COVID-19 situation" was worsening on a global scale.  (Docket Entry # 49, p. 24).

For the reasons already stated and the multitude of cases cited in Roman numeral I(4), plaintiffs' argument lacks merit. Plaintiffs fail to provide sufficient facts that COVID-19 causes "physical loss" that would establish coverage under the Business Income, Extra Expense, and Civil Authority provisions.  The absence of an exclusion does not automatically create coverage. See SAS Int'l, 2021 WL 664043, at *4 (quoting Given, 796 N.E.2d

at 1279) accord Select Hosp., 2021 WL 1293407, at *4.
Plaintiffs fail to provide sufficient evidence that COVID-19
causes the requisite "physical loss" to the property, and the
lack of a virus exclusion thus cannot support plaintiffs'
argument for coverage.

5.   Fortuitous Losses Not Otherwise Excluded

        Plaintiffs argue that coverage for COVID-related business
losses is available because the "all-risk" Policy "broadly
covers *all risks of loss* to the specified property unless
expressly caused by or resulting from an excluded peril."
(Docket Entry # 49, p. 13) (emphasis added).  They also contend
that the all-risk Policy provides coverage for any "'fortuitous
loss,'" even if not mentioned in the Policy.  (Docket Entry #
49, p. 13).  Due to the all-risk nature of the Policy,
plaintiffs reason that their "burden is minimal and generally
requires only that the insured show that a fortuitous loss has
occurred."  (Docket Entry # 49, p. 13).  Plaintiffs assert they
met this burden because COVID-19 and the Massachusetts and New
Hampshire orders caused such a "'fortuitous loss.'"  (Docket
Entry # 49, p. 13).

        Plaintiffs' arguments fail because, as explained in Roman
numeral II(1), the plain meaning of the Policy language requires
a "physical loss" or "physical damage" to trigger the coverage
provisions.  For this reason, Cincinnati correctly points out

that "[p]laintiffs' claim that the Policy covers all fortuitous losses . . . ignores the Policy's requirement of direct physical loss or physical damage to property." (Docket Entry. # 62, p. 18). Simply stated, the Policy does not provide coverage for COVID-19 because the presence of the virus is not a "physical loss" or "physical damage." Plaintiffs' position expands coverage beyond the unambiguous language in the Policy. As previously discussed, COVID-19 does not constitute the requisite "physical loss" or "physical damage." Similarly, as also previously discussed, the Massachusetts and New Hampshire orders do not constitute a "physical loss" to other property under the Civil Authority provision of the Policy. Summary judgment for plaintiffs is not appropriate.[15]

<u>CONCLUSION</u>

For the foregoing reasons, Cincinnati's cross motion for summary judgment (Docket Entry # 51) is **ALLOWED**, and plaintiffs' motion for summary judgment (Docket Entry # 47) is **DENIED**. Cincinnati is instructed to file a proposed final judgment consistent with this opinion on or before September 22, 2021.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[15] The denial of plaintiffs' summary judgment motion and allowance of Cincinnati's summary judgment motion moots Cincinnati's request "to disregard the inadmissible Affidavits and Exhibits when ruling on the pending Motions for Summary Judgment." (Docket Entry # 62, p. 20).